## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BRUCE SIMONS, on behalf of | : | |
| himself and all others | : | Case No. |
| similarly situated, | : | |
| Plaintiff, | : | **CLASS ACTION COMPLAINT** |
| | : | **FOR VIOLATION OF** |
| | : | **FEDERAL SECURITIES LAWS** |
| VS. | : | |
| | : | |
| EMCOR GROUP, INC., LEICLE E. | : | |
| CHESSER, FRANK T. MACINNIS and | : | |
| MARK POMPA, | : | |
| | : | |
| Defendants. | : | **JURY TRIAL DEMANDED** |

Plaintiff, by his undersigned attorneys, by way of this Complaint, alleges the following upon personal knowledge as to himself and his acts and as to all other matters upon information and belief, based upon, inter alia, the investigation made by and through his attorneys, including a review of the public filings of EMCOR Group, Inc. ("EMCOR" or "the Company") with the Securities Exchange Commission ("SEC"), as well as certain published reports and news articles.

## PARTIES.

1.      Plaintiff, Bruce Simons, as set forth in the attached certification, which is incorporated herein by reference, is a resident of Santa Clara County, California and purchased shares of EMCOR common stock in the open market between April 9, 2003 and October 2, 2003 inclusive (the "Class Period"), and suffered damages as a result of those purchases.

2.      Defendant, EMCOR, is a Delaware corporation with its principal executive offices and headquarters located in Norwalk, Connecticut.

3.      Defendant, Leicle E. Chesser ("Chesser"), was, at all relevant times, the  Executive

Vice President and Chief Financial Officer ("CFO") of the Company.

4.     Defendant, Frank T. MacInnis ("MacInnis"), was, at all relevant times, the Chairman of the Board of Directors and Chief Executive Officer ("CEO") of the Company.

5.     Defendant, Mark Pompa ("Pompa"), was, at all relevant times, the Vice President and Controller of the Company.

6.     Defendants, Chesser, MacInnis and Pompa, are collectively referred to in this Complaint as the "Individual Defendants."

## JURISDICTION AND VENUE.

7.     This Court has jurisdiction over the subject matter of this action under the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78aa, and 28 U.S.C. §1331.  The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), as well as Rule 10b-5, 17 CFR § 240.10b-5, as promulgated by the SEC.

8.     Venue is proper in this judicial district pursuant to the provisions of the Exchange Act and 28 U.S.C. § 1391(b).  Many of the acts and transactions giving rise to the violations of law complained of herein, including the preparation and dissemination to the investing public of false and misleading information, occurred within this judicial district.  In addition, EMCOR maintains its headquarters, principal place of business and executive offices within this judicial district.

9.     In connection with the acts, conduct and violations of law detailed in this Complaint, Defendants, at all relevant times, directly and indirectly, utilized the means and instrumentalities of interstate commerce, including the mails, telephone communications and the facilities of national securities exchanges.

## BACKGROUND

10.     This is a securities class action brought on behalf of all persons, other than the Defendants and related parties, who purchased or otherwise acquired shares of EMCOR common stock and other securities in the open market during the Class Period (the "Class").

11.     EMCOR is a global company that has approximately 27,500 employees worldwide and maintains its headquarters in Norwalk, Connecticut.  The company specializes in the design, installation and maintenance of complex mechanical and electrical systems, as well as facilities management that involves the maintenance and servicing of such systems.

12.     Despite relatively weak commercial construction, in 2002, EMCOR posted record earnings.  As reported in *The Hartford Courant*  (June 3, 2003), "[t]he Company's existing business grew in sales by slightly more than 1 percent, and acquisitions pushed its overall growth well into double digits."   According to Defendant MacInnis, this performance was accomplished "by pursuing more installation contracts under $5 million, and large maintenance agreements such as a $100 million contract with Bank One Corp."  *Id.*  In December, 2002, EMCOR also continued a "wave of acquisitions [when] EMCOR ... bought Arlington, Va. - based Consolidated Engineering Services Inc., a business with $420 million in annual revenues that strengthened EMCOR in maintenance and service contracts."

13.     Prior to the commencement of the Class Period, EMCOR and, specifically MacInnis, repeatedly trumpeted the Company's performance and provided the clear impression (albeit false and misleading) that EMCOR was experiencing strong demand and that its diversity placed it on sound financial footing.  For example, in a press release issued nationally by the Company through *Business*

*Wire*, EMCOR reported the following information regarding its business condition on March 18, 2003:

> EMCOR Group, Inc. (NYSE:EME) today announced that it has recently been awarded a number of projects in strategic markets expected to generate revenues of more than $220 million.
>
> "These projects illustrate the **continuing strong demand** for **EMCOR's diverse array of services in strategic markets across the U.S.,**" said EMCOR's Chairman and Chief Executive Officer, Frank T. MacInnis.
>
> Mr. MacInnis concluded, "Continued interest in healthcare facilities, power projects for electric utilities, and government and institutional facilities of all types continues to create strong business opportunities for EMCOR during this challenging economic environment.  Our diversity model of geography, markets served and services offered continues to perform as customers ask us to provide the services they require to manage their facilities environments.  From new construction, to retrofit and renovation, to operations and maintenance, to integrated facilities services, EMCOR has the skills that its customers need under all economic conditions."  (Emphasis added.)

14.     The Company also reported increased net income for the fourth quarter of 2002 in March, 2003, thereby enforcing the view that, notwithstanding a poor construction market, EMCOR was on a path of consistent and stable growth.  On March 24, 2003, the *Air Conditioning, Heating & Refrigeration News* reported the Company's fourth quarter 2002 financial results as follows: "Emcor Group Inc. (Norwalk, Conn.) reported that its 2002 fourth-quarter net income was $21.3 million, or $1.38 per diluted share, an increase of 22.4 percent over net income of $17.4 million, or $1.14 per diluted share in the fourth quarter of 2001."  *See also Plumbing & Mechanical* (April 2003)("EMCOR Group announced a 25.8 percent increase in net income for 2002 to $62.9 million, or $4.07 per diluted share").

15.     EMCOR reported these financial results in its annual report (Form 10-K) filed with the SEC on February 26, 2003, as amended on March 6 and March 27, 2003.

16.     Based upon this information and these representations, immediately prior to the Class

Period, *Business Week* published an exceptionally favorable article regarding the Company on March

31, 2003:

> **Emcor Group (EME) could be a stock for all seasons.**  Despite a shaky economy,
> business is booming for the leader in mechanical and electrical construction services: In
> 2002, orders jumped 22%, to $2.9 billion, and earnings rose to $4.07 a share on sales
> of $3.9 billion, up from 2001's $3.40 on $3.4 billion.  Emcor stock was stuck at 20
> when featured in this column on Feb. 21, 2000.  But it surged to 64 by May 6, 2002,
> even as the market plunged.  The stock slipped this year, to 46, as Iraq worries
> mounted.  Bulls say now is the time to buy.  Analyst Alex Rygiel of investment firm
> Friedman, Billings, Ramsey rates the stock outperform, and notes it trades at a 15%
> discount to its peers "despite a record of yearly 38% earnings growth and 12% sales
> growth."  He figures it will earn $4.60 a share in 2003 and $5.20 in 2004, and has a
> 12-month price target of 62.50.

> "**Neither a war nor slack in capital spending will slow our results**," says CEO
> Frank MacInnis.  **Emcor's other business - - managing buildings for clients such
> as Bank One and Procter & Gamble - - offsets any weakness in construction**,
> he says.  Of 2003's expected $4.6 billion in revenues, building management brings in
> $1.2 billion, twice what it was three years ago, says MacInnis.  Analyst Walter
> Kirchberger of UBS Warburg, who rates Emcor a buy, says **its value will be driven
> by its ability to maintain consistent and predictable [earnings]** and "a commitment
> to a conservative financial structure."  UBS has done banking for Emcor.  (Emphasis
> added.)

17.     As a result of these and other, similar representations regarding EMCOR's past

performance and diversification, the investing public treated the Company's securities as safe and stable

investments with predictable earnings.  EMCOR's common stock traded in a range from between

$45.12 to $49.70 in the month preceding April 9, 2003 with the value of the common stock steadily

rising during this period.

## MATERIALLY FALSE AND MISLEADING
## STATEMENTS ISSUED DURING THE CLASS PERIOD

18.     On April 9, 2003, before the market opened, EMCOR issued a press release

nationally through *Business Wire* announcing its revenue and earnings expectations for the first quarter

of 2003.  Even though quarterly earnings were now reported as being significantly lower than

anticipated, as well as compared to the first quarter of 2002, the Company explicitly reaffirmed its

earnings guidance for 2003:

> EMCOR Group, Inc. (NYSE:EME) today announced that it expects revenues for the
> first quarter of 2003 to be approximately $1.0 billion, compared to $810.3 million in
> the first quarter of 2002.
>
> Net income and diluted earnings per share for the first quarter of 2003 are anticipated
> to be approximately $3.3 million and approximately $0.21 per diluted share,
> respectively.  **The Company also reiterated its previously-issued revenue and
> earnings guidance for the full year of 2003**.
>
> EMCOR Group's anticipated 2003 first quarter results reflect solid revenue growth to
> record levels, including expected organic revenue growth of 3% to 4%, as well as
> improved gross margins versus the year-ago period.  The Company's anticipated
> results also reflect increased selling, general and administrative expenses, in part due to
> integration expenses associated with the Company's acquisition of Consolidated
> Engineering Services, Inc. ("CES") in December of 2002, as well as a shift in the
> Company's revenue mix, a greater proportion of revenues from EMCOR Group's
> facilities services operations, and increased interest expense as a result of the CES
> acquisition.
>
> The Company anticipates contract backlog as of 03/31/03 of approximately $3.0
> billion, versus $2.9 billion as of 12/31/02 and $2.5 billion at the end of the
> corresponding year-ago period.
>
> **Based in part on newly acquired contract backlog and its analysis of business
> trends, the Company reiterated its previous financial guidance for the 2003 full-
> year period, with revenues in the range of $4.4 billion to $4.6 billion, and diluted
> earnings per share between $4.25 and $4.60**.

Frank T. MacInnis, Chairman and CEO of EMCOR Group, commented, "**As we have stated previously, our first quarter results are typically affected by negative seasonal factors, augmented in this quarter by challenging business conditions and the investment we are making to integrate the CES and EMCOR Facilities Services businesses.  When integration is completed, we will leverage our $1 billion position in the growing facilities services market to drive revenue growth and operating efficiencies**."

Mr. MacInnis continues, "**Our ability to generate organic growth reflected in both revenue and backlog speaks to the continued successful execution of our diversity model, which has resulted in growth despite the difficult macroeconomic environment.  Our business remains on track, and we remain comfortable with the financial guidance we have provided for 2003**."

The Company expects to announce its financial results of the first quarter of 2003 before the market opens on Thursday, April 24, 2003.  (Emphasis added.)

19.     In its April 9, 2003 press release, EMCOR did not disclose (even though it knew) that its "newly acquired contact backlog" ("contract backlog") was significantly and materially weighted toward less profitable public sector and quasi-public sector construction projects, which historically had been and, at that time were, significantly less profitable as compared to the Company's private sector construction projects.  As a result of the composition of EMCOR's  backlog as of April 9, 2003, which the Company and Defendants constantly monitored and knew had been materially depleted of profitable private sector projects, Defendants knew that the EMCOR was not capable of meeting its earnings projections -- absent a significant and expeditious increase in private sector construction spending in the form of (a) smaller, short-term projects generating revenues of less than $250,000 (that the Company does not include in its contract backlog calculations), and/or (b) an immediate accretion to its contract backlog in the form of larger, more profitable private sector projects that could generate revenues and profits in 2003.  In addition, as of April 9, 2003, based upon market conditions, the

Company had no basis to reasonably believe that (a) smaller, short-term projects generating revenues of less than $250,000 would contribute equal (much less greater) profits to EMCOR's bottom-line in 2003 as compared to 2002, (b) an immediate accretion to contract backlog in the form of larger, more profitable private sector projects that would occur that could generate revenues and profits in 2003, especially since the distribution or mix of EMCOR's contract backlog had consistently shifted between 2000 and 2003 from more profitable private sector construction contracts to less lucrative, or (c) any other backlog or market trends would contribute sufficient increased earnings to off-set the fact that the Company would be performing significantly less profitable work in 2003 (as compared to 2002).

20.    The Company specifically failed to disclose that, as a result of a material change in the "mix" of work that EMCOR was performing in 2003 (and had any reasonable expectation of performing in 2003), all as part of an effort to diversify its business model to weather and maintain downturns in private sector construction spending, the Company had shifted to less profitable markets (i.e., public sector and quasi-public sector construction contracts), which materially impaired EMCOR's ability to generate profit margins (a) similar to those that it had achieved in 2002, or  (b) sufficient to meet the earnings guidance that Defendants had provided to the investing public for 2003, especially in light of EMCOR's poor 2003 first quarter performance.  Defendants also failed to disclose that, as a result of the Selling General and Administrative ("SG&A") expenses related to its facilities management business, EMCOR could not and would not earn the same level of profits from revenues as it customarily did in its construction business(es).  In sum, Defendants failed to disclose that EMCOR's "guidance" with respect to earnings expectations in 2003 was predicated on a reckless bet by Defendants that private sector construction spending, including the smaller and most profitable

projects that EMCOR had relied upon in the past to generate a significant portion of its earnings, would increase during the remainder of 2003 (when compared to its performance in 2002). Defendants' failure to disclose these material facts rendered its announcements regarding expected income and earnings per share for 2003 both reckless and false.

21.     Despite the Company's lackluster performance in the first quarter of 2003, EMCOR's announcement that it expected to meet its full year guidance with respect to earnings was widely reported in the press and otherwise disseminated throughout the market. *See, e.g., Investor's Business Daily* (April 11, 2003)("Emcor expects to earn 21 cents in Q1 vs. views for 54 cents, though it backed full-year views.")   As a result, the Company's announcement had its intended result and EMCOR's common stock price remained stable, closing down slightly from a close of $49.70 per share on April 8, 2003 to a close of $48.33 on April 9, 2003 and then trading back up to a close of $48.80 per share within one week (a price higher than the stock had traded at the beginning of April, 2003).

22.     On April 24, 2003, EMCOR issued the following press release on *Business Wire* which confirmed its previous guidance with respect to the Company's performance during the first quarter of 2003:

> EMCOR Group, Inc. (NYSE:EME) today reported first quarter results.
>
> Net income for the first quarter of 2003 was $3.3 million, or $0.21 per diluted share, directly in line with recent market guidance, compared with net income of $7.3 million, or $0.47 per diluted share, in the first quarter of 2002. **Revenues for the 2003 first quarter were $1.1 billion, an increase of 30.9% over revenues of $810.3 million in the year ago period. 2003 first quarter revenue levels reflect organic revenue growth of more than 6%.**

**For the first quarter of 2003 the Company reported operating income of $7.6 million, versus operating income of $12.5 million in the first quarter of 2002. Operating income as a percentage of revenues was 0.7% versus 1.5% a year ago.**

On March 1, 2002, the Company acquired 19 companies from Comfort Systems USA, Inc.  On December 19, 2002, the Company acquired Consolidated Engineering Services, Inc. ("CES").  These acquired companies contributed an aggregate of $200.6 million in revenues and $0.2 million in operating income to the Company's 2003 first quarter results and represented substantially all of the $32.3 million, or 42% increase in Selling, General and Administrative expense over the year-ago period.

**The Company's backlog** of construction and facilities management contracts as of March 31, 2003 **was a record $3.1 billion,** an increase of 23% compared with backlog of $2.5 billion on March 31, 2002 and up from $2.9 billion at the end of December 2002.  EMCOR's backlog at the end of March reflects year over year organic growth of 16%, as well as $166 million of backlog derived from the acquisition of CES.

Mr. MacInnis added, "However, **the quarter also demonstrated the strength of our business model, as demonstrated by the growth in organic revenue and backlog, both of which surpassed our expectations**.  **In addition, the benefits of EMCOR's diversity model were apparent, notably in our facilities services businesses which demonstrated solid growth in revenue and profitability that offset seasonal slowdowns in our traditional construction businesses**.  The Facilities business is good: today we announced the award by British Airways of a three-year contract as the airline's single-source provider of facilities management services for most of its UK property portfolio, including Heathrow and Gatwick Airports.  This award exemplifies the versatility of EMCOR's diversity model, in this case helping us to build on an already strong 11-year relationship with the leading international air carrier."  (Emphasis added.)

23.     EMCOR confirmed these results in quarterly report (Form 10-Q) filed with the SEC on April 24, 2003, which was signed and the truth and accuracy of which was ascribed to by Defendants MacInnis and Chesser.

24.     In a conference call with investors and research analysts on April 24, 2003, EMCOR's senior management, MacInnis, Chesser and Pompa, as well as additional participants, Bruce Scrawski,

the Company's Director of Communication and Sheldon Cammaker, the Company's Executive Vice

President and General Counsel, continued to ascribe the Company's poor 2003 first quarter

performance as reflecting merely seasonal trends and one-time charges, thereby assuring the investing

public that there was no reason to be concerned about EMCOR's performance during 2003, and failed

to disclose that EMCOR's marked fall in profitability (both in gross and absolute terms) from the first

quarter of 2002, reflected a systemic change in the Company's work to considerably less profitable

contracts.  In this April 24, 2003 conference call, as reported by *FD (Fair Disclosure) Wire*,

Defendants reported the following information:

> FRANK MACINNIS: The first quarter of 2003 is our 31st consecutive profitable
> quarter, a remarkable record of consistent performance through many industry changes
> and macro economic cycles.  **It was also another typically weak first quarter from
> an earnings standpoint, a pattern that we've replicated year after year, and
> which is a product of seasonal factors like weather related inefficiencies and
> customers' budget allocation cycles, together with EMCOR's conservative
> income recognition accounting policies**.

> Exacerbating these normal seasonal factors were continuing challenging conditions,
> notably in our private sector commercial markets, particular weakness in our UK
> operations, and overhead costs, assumed and expended, in connection with integration
> of CES.

> As a result of all these factors, earnings for the quarter were $3.3 million, or 21 cents
> per diluted share, compared with 7.3 million or 47 cents a share in the year ago period.
> Despite the numerous challenges I just referred to, revenues for the quarter were an all
> time record 1.1 billion in the first quarter, a 31 percent increase over last year's quarter
> and very importantly, a 6 percent increase in revenue from organic sources.

> Gross margins as a percentage of revenue were constant year over year at 11 percent,
> suggesting that EMCOR's diversity model has continued to provide us with
> opportunities for revenue growth at acceptable margins despite the economic
> circumstances.

> Of particular note during the quarter was an increase of 32.3 million or 42 percent over

first quarter 2002 levels in selling, general and administrative expense, and 10.3 percent of quarterly revenues compared to 9.5 percent a year ago.  31.7 million or 98 percent of the increased overhead costs were directly attributable to the CES acquisition and integration process, which is continuing as we speak.

*          *          *

Our US mechanical and service activities reflected increased revenues with decreased operating margins, primarily as a result of continued recessionary pressure on our Midwestern US markets.  US facility services increased dramatically in terms of both revenues and operating profit, moving from a loss in the first quarter of 2002 to a substantial profit this year.

*          *          *

**EMCOR's contract backlog, consistently and conservatively calculated, has risen from about $1 billion at the end of 1997 to more than $3 billion today. This growth has been accomplished, despite a major recession and its impact on the former flywheel of our business, the private sector commercial market. Through replacements and enhancements of overall contract backlog, despite a major decline in commercial building construction, is a statement of our versatility and of our success in accessing strong markets like government and institutional work, healthcare, water and wastewater treatment and public transportation.**

*          *          *

**This is the kind of long-term performance that our diversity model was designed to produce and it's working.  Two months ago I provided 2003 revenue and earnings guidance to the market at levels of 4.4 to $4.6 billion of revenue and $4.25 to $4.60 earnings per share.  Based on our current outlook, I'm pleased to reiterate that guidance today.**  (Emphasis added.)

25.      In the same conference call, although MacInnis admitted that EMCOR's expanding

facilities management business necessitated increased SG&A expenses, he failed to disclose that, in

light of the lower net profits associated with the facilities management business, the Company remained

dependent upon a resurgence in more profitable private sector construction spending if it was to have

-13-

any hope of meeting its earnings guidance:

> JAMIE COOK, ANALYST, CREDIT SUISSE FIRST BOSTON: My first question-
> -if we look at your SG&A, I understand that it was higher because of the integration
> cost with the – **and it should run higher just because you have a larger
> percentage of facility services in there**....
>
> FRANK MACINNIS: Yeah, let me take the last portion of the question first, Jamie....
> **One of the characteristics of facilities service is that it attracts a higher
> proportionate level of general administrative expenses, in part because of the
> enhanced marketing and sales activities associated with the business compared
> to construction, and in part because of some of the on call nature of the work
> performed**.
>
> The result is that as we have planned and modeled going forward our enhanced
> participation in the facilities service business, we have also expected that there would
> be an incremental increase in the proportionate relationship of SG&A charges to our
> overall revenues, but certainly not at the level of 10.3 percent, which we experienced in
> the first quarter 2003....
>
> JAMIE COOK: But can you quantify the one time charge [related to the CES
> acquisition], I mean, the one time items that you talked about or, I mean, do you have
> those numbers or you just don't want to give them out?
>
> FRANK MACINNIS: **We do not have those numbers**.  They are, as you can see, a
> large number and they are a mixture of evolving systems and evolving workforces, that
> we are just working as fast as possible to get normalized.  What we can say with
> extreme certainty is that they are going to be lower when they are normalized than they
> are now....  (Emphasis added.)

MacInnis and EMCOR notably failed to disclose how they could offer any legitimate and reasonable

forecast of earnings without an ability to determine the amount of SG&A expense that related to "one

time charges" – as opposed to base-line SG&A – that obviously would significantly impact net profit in

the facilities management business, which EMCOR had become increasingly dependent upon the

generate earnings in light of its acquisition of CES *and* its declining private sector business.

26.     During the April 24, 2003 conference call, Defendants also continued to conceal the

effect of the systemic and continuing change in its contract backlog that would undoubtedly impact its profitability and earnings absent a significant change in private sector construction spending and/or a dramatic change in EMCOR's success in obtaining such work:

> ALEX RYGIEL, ANALYST, FRIEDMAN, BILLINGS & RAMSEY: ... A couple quick questions - - **first, with regards to your backlog, can you give us a general comment on where margins in your backlog are today relative to where they were maybe 12 months ago and relative to where your margins were for your revenue stream in the first quarter**?

> FRANK MACINNIS: I think - - and Alex, this is a very involved question because there are thousands of projects that we're talking about here. In looking at the quality of backlog, we don't have a better way to look at it than by looking at the evolution of the gross margin percentages that we're reporting from backlog burn off.

> **And I would say that as a consequence that the long term projects that have been added to backlog - - and it's a higher proportion of them than was the case a year ago - - have acceptable margins**. We reported 11 percent gross margin in the first quarter and that was despite having a smaller than usual proportion of small short term projects that typically have a higher gross margin for us.

> So I was quite satisfied with the gross margin performance during the first quarter and what that reflected in terms of the adequacy of the margins available from the work that we are currently bidding and occupied.

> ALEX RYGIEL: Second question - - you know, a couple months ago when you were talking about guidance for 2003 you did some simple math that talked about backlog that you would burn out in 2003, **you talked about your facilities services revenue stream and then you talked about the unknown revenues coming from this fast track work, this short term, quick turn business, which usually represents about a third of your business. Now that we're about four months into the year, can you talk a little bit about how that business is progressing, the business that doesn't flow through backlog and what you expect over the next eight months or so**?

> FRANK MACINNIS: **Well, the revenue that we need to book, whether short term or long term, is still a substantial number but we're making excellent progress towards it. I think that our first quarter revenues were frankly a little higher than we expected. They showed very substantial organic growth, even**

-15-

**though I will still say that the quick turn, small task, short term projects that make up a substantial part of that business and a substantial part of our profitability, are still not as strong as we would like, because a great many of those are associated with the private sector and the commercial buildings market.**

So despite that weakness, I think that the diversity model is working.  We're extremely happy about the backlog evolution and clearly, we are booking work faster than we are burning it, despite record levels of burning it.  And accordingly, I think that all the fundamentals are there to give me a confident feeling about the record revenue levels that I continue to project for 2003 of 4.4 to 4.6 billion.

27.     These statements by MacInnis on behalf of EMCOR were false and misleading when issued for the following reasons: (a) EMCOR maintains sophisticated internal financial monitoring systems that enable it to evaluate contract backlog on a daily basis and Defendants knew that, based upon the contract backlog as of April 24, 2003, lower margins, profits and earnings could be expected from the Company's construction business in 2003; (b) MacInnis effectively "ducked" the question regarding the margins of EMCOR's then current contract backlog, choosing instead to assert that the Company was operating at "acceptable margins" even though Defendants knew or should have known that the lower margins implicated by EMCOR's then current contract backlog only were "acceptable" in light of the Company's failure to maintain a higher percentage of profitable private sector work in its contract backlog; (c) MacInnis failed to disclose that EMCOR's earnings guidance was predicated upon a significant and material increase in "the quick turn, small task, short term projects that make up a substantial part of [the Company's] business and a substantial part of our profitability" even though the Company had experienced disappointing results in attracting such work during the first third of the year in 2003; and (d) MacInnis continued to equate "record revenue levels" with the earnings guidance that EMCOR had provided without regard for the "level" of profitability and earnings that the Company

reasonably could predict based upon the information available to it at that time.

28.     During the April 24, 2003 conference call, MacInnis and Chesser also assiduously avoided disclosing the extent of EMCOR's reliance upon these quick or fast turn projects to the Company's bottom-line by materially understating EMCOR's reliance upon these projects to generate earnings (25% or more in past years) and sought to persuade the investing public that EMCOR's work in this highly profitable field had remained constant since 2000 even though it had slowed considerably during the first quarter of 2003 and, as of April 24, 2003, Defendants had reasonable no basis to expect that the Company's fast turn projects would increase during the remainder of 2003 (especially since such work is inextricably related to EMCOR's other private sector construction projects which were in decline):

> JAMES CAPELLA, ANALYST, KERN CAPITAL: **In the quarter do the bucket of revenue that's 250,000 that's fast turn projects, what percent of total revenue was that, and where was that last quarter**?

> *       *       *

> LEICLE CHESSER: **We have 250 million of increase in revenue over last year, of which 200 million of that came from acquisitions.  I don't recall any comment on fast turn work, quantifying that**.

> *       *       *

> JAMES CAPELLA: Yeah, so you guys usually don't put that in the backlog.

> FRANK MACINNIS: Oh, oh, oh, oh, okay.  The - - yes, the - - as I was mentioning on the previous question from Alex, I think that it's fair to say that we're still not seeing a substantial improvement in that kind of fast turn work.  **That is the kind of voluntary small under-the-radar capital spending that we frequently get from owners or end users of commercial buildings and it, like the rest of the commercial buildings market, continues to be depressed**...

-17-

JAMES CAPELLA: Okay, and could you quantify the percent of revenue derived from those 250 and under?

LEICLE CHESSER: No, we have not broken that down.  **Historically it's in that 20 percent range**.

JAMES CAPELLA: Right.

LEICLE CHESSER: And like you said, it's probably a little bit livelier seeing a trend towards longer term projects, but it's not a huge deviation.

JAMES CAPELLA: **Okay, and then related to that, when did you guys start seeing the weakness in the fast track business**?

FRANK MACINNIS: **In 2000**.  (Emphasis added.)

29.     MacInnis and EMCOR continued to reiterate its earnings guidance for 2003 (despite the Company's poor performance during the first quarter and despite the fact that Defendants had no reasonable basis to expect such earnings in 2003) and, in fact, sought to persuade the investing public that EMCOR's guidance was, in fact, conservative, by falsely claiming that the Company's earnings guidance did not assume any significant improvement in private sector construction spending:

JAMES CAPELLA: ... **[H]owever, there seemed to be a disconnect for what the Street had to where you guys were coming in the quarter.  Can you address any kind of linearity for the rest of the year in terms EPS target**?

FRANC MACINNIS: Well, as you know, just to reiterate it, my annualized guidance, I've said many times in the past that I think it's unwise and unproductive to provide specific quarterly guidance and I'm very sympathetic with people whose jobs require them to do so because it's a difficult task, particularly when you have a big company like ours with a small number of shares out with resulting sensitivity and volatility.

**It goes without saying that by reiterating annualized guidance,** my own view is that we will continue to perform well on a revenue line, that we will continue to show substantial performance on the gross margin level, that we will reduce the percentage of SG&A as it relates to revenue and that we will, **with the advantage of better visibility than I had when I first provided it two months ago, I'm confident of our**

**ability to make our guidance for the year**.

With respect to any perceived shortfall that exists between what the analysts' consensus used to be for our first quarter and what we have just announced, you are quite correct in pointing that out, but you have also, you're also quite correct in pointing out that we didn't ever guide to the first quarter and given the fact that in dollar terms the shortfall between the previous analysts' consensus and our performance is something like $4 million on 1.1 billion, I don't have much concern about our ability to make up that on a shortfall over the remaining 3.5 billion or so of revenue that we expect to report this year.

JAMES CAPELLA: Okay, and lastly, could you comment on where you think in the fourth quarter the gross margin or operating margin might rise up to?

FRANK MACINNIS: It is fair to say that the first quarter represented the replication of a pattern that we always reflect, and that is that our first quarter's always weak in earnings terms for reasons that I went into at length on the call.  Our second quarter improves; typically SG&A levels come down because of the absence of various prepayments and the development of revenues.  Profitability improves, among other things, because of improved efficiency due to the lack of weather constraints.  I don't know if anybody noticed, but this was a Preeti [sic] bad winter in a great many areas of our business.

And the fact that as projects reach the 20 percent completion level, our conservative accounting policies permit us to begin booking income on those projects.  **So typically - - and I'm talking about year after year for the last eight years - - EMCOR Group has shown an acceleration of earnings performance as we go through the year, up to and culminating in the fourth quarter.  So I have no reason to think that we won't do that again this year**.

\*          \*          \*

PREETI DUBAY, ANALYST, STIFEL NICOLAUS HANIFEN IMHOFF, INC.: ... Okay.  And so, when do you think you will be able to get back to your normal profitability trends there?

FRANK MACINNIS: Well, **I think that we are going to get back to our normal profitability this year due to a number of factors, one of which will be the good performance of our facilities service business, even if we continue to anticipate weakness in some sectors of the private market**.

As I mentioned during the last conference call, my underlying assumptions with respect to the lower end or base case per our guidance - - that is $4.4 billion of revenue and 4.25 per share - - do not assume any improvement in the private sector for the remainder of this year.  **That is status quo with what pertained at year end, whereas the upper end of the range that I reiterated this morning - - $4.6 billion of revenue and $4.60 per share - - assume a modest improvement in the private sector in the second half of this year**....  (Emphasis added.)

30.     For the reasons explained above, and especially in light of (a) the systemic change in the "mix" of EMCOR's "contract backlog," (b) the Company's poor performance in obtaining "fast turn," high profit contracts and (c) EMCOR's change in focus to a more stable revenue but lower profit margin facilities management business, Defendants had no reasonable basis to expect the "status quo" in terms of net profit in 2003 and, therefore, issued false and misleading statements regarding EMCOR's earnings guidance in 2003 when compared to its revenue guidance for that year.

31.     In a television interview broadcast on the Cable News Network ("CNN") on May 20, 2003, MacInnis continued to assert that EMCOR's diverse business model could produce continued levels of profitability despite his admission that most of EMCOR's projects were public sector in nature:

*THE MONEY GANG 01:00 PM Eastern Standard Time May 20, 2003 Tuesday*

PAT KIERNAN, CNNfn ANCHOR, THE MONEY GANG: Let's move on to a company that "BusinessWeek" called a possible stock for all seasons, even though it's not a household name.  It's EMCOR (Company: EMCOR Group Inc.; Ticker: EME; URL: http://www.emcorgroup.com/) a mechanical and electrical construction firm, it counts some like Heathrow Airport and Bank One (Company: Bank One Corporation; Ticker: ONE; URL: http://www.bankone.com/ among some of its clients.

ALI VELSHI, CNNfn ANCHOR, THE MONEY GANG: Frank MacInnis is EMCOR's chairman and CEO.

Welcome back to THE MONEY GANG.

FRANK MACINNIS, CHAIRMAN & CEO, EMCOR: Thanks, guys.

VELSHI: Good to have you here.  What do you think of that?  Are you really a company for all seasons?  Or maybe we should more accurately say for all economic climates.

MACINNIS: I think our record shows that.  We just reported our 31st consecutive profitable quarter.  "Fortune" magazine listed us as No. 15 for five-year earnings growth, meaning that we performed well in a good economy and a bad economy.

KIERNAN: You wrapped up an acquisition late last year of a firm in the facilities management business, and you've been increasing your own presence in that area.  This is an initiative that gets you away from those individual contract wins that you have to get when you're in the strictly construction side, and allows you an ongoing revenue flow that would carry the company through several years out of ongoing revenue.  Is there an effort to diversify in that direction, to bring in something that happens after you've actually finished a project?

MACINNIS: Absolutely.  That's the Emcor model in a nutshell, a combination of construction projects that, of course, have a beginning and an end, that take advantage of the economic cycles on the upside.  But, at the same time, having long-term contractual relationships with facility management customers, like British Airways (Company: British Airways plc; Ticker: BAB; URL: http://www.britishairways.com/) and like Bank One, relationships that extend over a term of years, usually three, but sometimes five, or even 10 years.

KIERNAN: As far as that construction revenue, is there one geographic area where you're seeing a faster uptick?

MACINNIS: We're seeing very small anecdotal increases in commercial spending in certain parts of the country, California maybe a little bit.  And a little bit in New York City.  **But overall, we're still reliant, primarily, on the public and quasi-public sector for our growth this year**.  (Emphasis added.)

32.     On June 10, 2003, MacInnis provided a similar interview to CNBC and continued to

project a positive outlook for EMCOR in terms of *both* revenue and earnings for 2003:

BRAD GOODE, CNBC ANCHOR: Of all the sectors that might signal an economic turnaround, one will literally rebuild business when contracting gives way to capital spending.

LIZ CLAMAN, CNBC ANCHOR: This morning, materials and construction industry

leaders will gather for the Credit Suisse First Boston Engineering and Construction Conference here in New York to discuss innovative blueprints to produce profits.

For his outlook, we're joined now by conference presenter Frank MacInnis, Chairman and CEO of Emcor Group.  Good to see you and thank you for being here.

MACINNIS: We've had a real good run, both in good times and in bad, and this is not the way that construction companies are supposed to behave in recessionary times. We've done that through a very diverse group of service offerings that appeal to customers whether they are on the upside or the down side of their own economic cycles.  **And in recent years, we've been able to move aggressively into the public sector, into transportation projects and the like, which have not been severely affected by the recession, and also into general facility service offerings that are attractive to customers even when their businesses are poor**.

CLAMAN: **I want to talk quickly about a first quarter operating income decrease to about $7.6 million from $12.5 million year over year, with the operating margins cut by more than about a half.  How did you plan or what have you done to at least make up for that lost chunk there and do you see that coming through right now**?

MACINNIS: Well, the first quarter results were depressed over the year previous, but for a good reason.  They had to do with our integration expenses associated with a major purchase that we made just before Christmas last year.  We bought a company, or a group of companies called Consolidated Engineering Services - -

CLAMAN: In December of 2002?

MACINNIS: That's right -- which is a premier facilities services group that enabled us to bring our annualized revenues from the services business to more than a billion dollars.  So we are proud of that and we're spending money naturally to integrate those companies into broader operations, but that will be over soon. (Emphasis added.)

33.     In these television interviews, however, MacInnis failed to disclose that, although

EMCOR was relying upon public sector and quasi-public sector construction work, as well as facilities

management, to increase revenues and growth in terms of revenues, the Company had no reasonable

basis to expect that such increased revenues in materially less profitable sectors of its business would

result in the earnings growth that he continued to knowingly or, at the very minimum, recklessly (based upon facts then known to him) assure the investing public that EMCOR would achieve in 2003.

34.     On July 24, 2003, two weeks after MacInnis dismissed poor first quarter earnings as related to the CES acquisition and effectively "ducked" the question of how EMCOR would make up for those lost earnings, the Company was forced to disclose that, for the second quarter of 2003, EMCOR had again met revenue expectations but had performed abysmally in terms of income or earnings (as a percentage of revenues and in absolute terms) and that the Company would need to revise (downward) its guidance for annual earnings per share of common stock.  Specifically, in a press release issued nationally over *Business Wire* on July 24, 2003 before the market opened, the Company announced the following financial results for the second quarter of 2002:

EMCOR Group, Inc. Reports 2003 Second Quarter Results

**Net income for the second quarter of 2003 was $8.3 million, or $0.53 per diluted share, compared with net income of $14.8 million, or $0.96 per diluted share, in the second quarter of 2002.  Revenues for the 2003 second quarter were $1.1 billion, an increase of 16.0% over revenues of $986.4 million in the year ago period.  Organic revenue growth was 4.4% in the second quarter of 2003 compared to the second quarter of 2002.**

For the 2003 second quarter, gross profit rose to $123.3 million from $120.2 million in the second quarter of last year.  **Gross profit was a percentage of revenues was 10.8% in the second quarter of 2003, compared to 12.2% in the second quarter of 2002.**  The Company's gross margins reflect decreased profitability in its mechanical business, primarily due to difficult economic conditions in the Midwest which, combined with a later than expected start of hot summer weather, resulted in an unexpected decline in higher-margin, discretionary work orders.  Gross margins were also impacted by operating losses from the Company's U.K. operations.

For the second quarter of 2003, the Company reported operating income of $16.6 million, versus operating income of $26.9 million in the second quarter of 2002.  Operating income as a percentage of revenues was 1.5% versus 2.7% in the same

quarter last year.

At June 30, 2003, the Company's backlog of construction and facilities management contracts was $3.2 billion, an increase of approximately 14% versus backlog of $2.8 billion on June 30, 2002 and an increase of approximately 2% over its $3.1 billion backlog on March 31, 2003.  Organic growth of the Company's backlog versus the year ago period was approximately 8%.

**For the first six months of 2003, the Company reported operating income of $24.2 million, compared with operating income of $39.5 million in the year-ago period.  As a percentage of revenues, operating income for the 2003 first half was 1.1% compared with 2.2% last year.**

**Mr. MacInnis added, "Looking ahead, we see little evidence of any short-term improvement in the private sector commercial market.  While we are comfortable reiterating revenue guidance for 2003 of between $4.4 billion to $4.6 billion, especially in light of our strong year to date revenue and backlog performance, we currently expect diluted earnings per share for the 2003 full-year period to be in the range of $2.90 - $3.10."**  (Emphasis added.)

35.     EMCOR confirmed these results in quarterly report (Form 10-Q) filed with the SEC on

July 24, 2003, which was signed and the truth and accuracy of which was ascribed to by Defendants

MacInnis and Chesser.

36.     In response to these disclosures, as reported by *AFX.COM* on July 24, 2003,

"[s]hares of Emcor fell more than 17 percent after the construction services company missed second-

quarter earnings estimates and indicated that full-year results would fall short of expectations."

37.     As *Investor's Business Daily* similarly reported on July 25, 2003:

Emcor Group sank 6.19 to 42.03, its lowest level in more than two years, on its heaviest volume so far this year.  The provider of mechanical and electrical systems earned 53 cents a share in the second quarter, down 45% from a year ago and 32 cents shy of views.  It cut its '03 profit guidance to $2.90-$3.10 from its prior target of $4.25-$4.60.

38.     Nevertheless, Defendants continued to offer a relatively rosy view and materially false

information regarding EMCOR's prospects for 2003.  In a conference call with analysts and investors

on July 24, 2003, Defendants persistently downplayed the serious and pervasive nature of the

difficulties that the Company was encountering in generating healthy gross margins and profits while

falsely attributing EMCOR's difficulties to exceptional instances that would not be recurring in nature.

As reported by *FD (Fair Disclosure)* Wire, MacInnis made the following statements during a July 24,

2003 conference call with investors and analysts that followed EMCOR's negative earnings

announcement earlier that day in which MacInnis, Chesser and Pompa, as well as Mayva Heffler, the

Company's new Vice President of marketing and communications, participated:

> FRANK MACINNIS.... The second quarter of 2003 was the 32nd consecutive
> profitable quarter reported by EMCOR Group.  The remarkable record of consistency
> and growth.  We are proud of our history and the unique business model that made it
> possible.  But our second quarter results were more complicated and mixed than is
> usually the case in our company.  **As we discussed in this morning's press release
> our second quarter revenues and midyear backlog set new records for the
> company and reflected strong organic growth**.  Clearly our markets and our strong
> position within those markets remain in tact and even growing.  Both our electrical
> construction and our important facility business grew in revenue and profitability over
> the year-ago period.  On the other hand, our mechanical and construction service
> businesses experienced a slight reduction in revenue and **significant reduction in
> operating profit compared to 2002** for a number of coincident reasons....
>
> *          *          *
>
> **Quarterly revenues of $1.14 billion were 16% higher than a year ago**.  A result
> of the December 2002 purchase of CES together with year over year organic revenue
> growth of 4.4%, Gross profits increased in dollar terms to $123.3 million to $120.2
> million in the second quarter of last year but declined as a percentage of revenues as a
> result of mechanical sector and UK results just discussed to 10.8% of revenues from
> 12.2% in the year-ago period.  General administrative costs rose in dollar terms due to
> the inclusion and integration of CES, but fell as a percentage of revenue 9.3%
> compared to 10.3% in the first quarter of 2003 and 9 poining[sic]  5 - - and 9.5 a year
> ago.  **Declining margins, as discussed reduced
> EBIT to $16.6 for the quarter compared to 26.9 million a year ago**....  Revenues

-25-

for the first half of 2003 were $2.2 billion.  22.7% higher than a year ago including 5.2% growth from organic sources.  **Operating income and net income affected by the cost of CES integration together with the operational factors already discussed were $22.2 and $11.5 million respectively compared to 39.4 million and 22 million a year ago.  Year to date diluted earnings per share were 74 cents compared to $1.43 in 2002**....

* * *

This slide shows the intra-year and annual pattern of EMCOR's revenue and EBIT over the last 7.5 years.  **Every year exhibits the same characteristics: a slow start, especially in EBIT terms due to seasonal impact on productivity and to our conservative accounting policies with respect to revenue recognition on multi period projects.  As productivity improves and our income recognition policies permit, profitability increases significantly while revenues typically grow more slowly.  We expect the same intra-year pattern to occur in the second half of 2003, albeit from a lower base in the case of our EBIT performance.**

Our year to date revenues are in line with internal budget expectations, and our contract backlog is above budget, although it continues to be overweighted toward longer term, slower burning projects of a larger than normal average size.  We expect second half revenue to be similarly strong at levels of 2.2 to 2.4 billion dollars, and we reiterate full year 2003 revenue guidance of 4.4 to 4.6 billion dollars.  We also expect our contract backlog balance to remain strong.  **Our previous guidance with respect to profitability was explicitly based on the maintenance of the status quo which existed at the end of 2002 with respect to both our public and private sector market demand.**  That assumption did not materialize.  We have, in fact, experienced a further deterioration in our private sector mechanical construction and service markets, notably in the midwestern and northeastern U.S.  For reasons and with results already presented and discussed.  **Although most economists expect a general economic recovery to take route in the second half of 2003 and to accelerate in 2004, we are unwilling to rely on any such general improvement in our overall markets.**

Especially since it, too, was affected by the downward pressures on the demands and margins and we expect it to grow in both revenue and profit terms in the second half now that integration is essentially complete.

In light of the foregoing assumptions, we estimate second half fully diluted earnings per share to be in the range of $2.16 to $2.36.  Weighted slightly toward the fourth quarter.

Resulting in revised 2003 full year earnings per share guidance of $2.90 and $3.10. The corresponding net income, EBIT, EBITDA, and EPS are as follows, net income of 45 to $50 million.  Ebit of 88 to 94 million.  EBITDA of 111 to 117 million dollars and free cash flow of 50 to 55 million dollars.

**The second half and full year operating results will be the product of a number of moving parts, as usual.  In order to explain the kind of analysis that leads to us our $3 range for full year guidance we offer the following general expectations: $3 earnings per share requires that EMCOR produce about $67 million of EBIT from second half operations.  If we assume the second half revenue was equal to the first half of 2.2 billion, as assumption by the way that I consider very conservative, then the following assumptions would produce the $3 result: second half gross margins at 12.3% compared to 12.6% for the last half of 2002.  Second half, general administrative costs at 9.2% of revenues compared to the same percentage for 2002, and second half EBIT of 3.1% of revenue compared to 3.45% for 2002.  In other words we don't have to perform as well in the last half of this year as we did a year ago in similar market circumstances in order to achieve our $3 range for the year.**

**We consider this illustration and this scenario to be realistic, conservative, and achievable.**  (Emphasis added.)

39.     Although Defendants now admitted that they had predicated their earlier, faulty guidance on an assumption that the "status quo" would be maintained in terms of profitability (despite their prior knowledge that, based upon the Company's shift in contract backlog to less profitable work, a decline in the Company's ability to obtain highly profitable fast turn projects and the Company's shift to less profitable facilities management services), they still failed to reveal the true financial circumstances of EMCOR, which were then known to them, and continued to issue false, reckless and highly speculative earnings guidance based upon gross margin and SG&A performance in the second half of 2003 that they knew or, at the very minimum, should have known were unattainable based upon the Company's true financial circumstances.

40.     Despite the fact that EMCOR could not attain its revised earnings guidance without a

substantial improvement in private sector construction contract backlog and fast turn projects, and

Defendants knew or should have known this fact, MacInnis continued to falsely assert that EMCOR's

revised earnings guidance was not based on any prediction or expectation of improved private sector

earnings while effectively denying that the Company had systemically moved into markedly less

profitable markets in order to retain and expand revenues:

> FRANK MACINNIS: ... Our competition hasn't gotten any larger or more - - or stronger or more profitable and we are in position where we will benefit short and long-term from the inevitable resurgence of private sector demand. **But I am willing to guess publicly as to when that resurgence will be and I make no such assumption concerning that resurgence for the purpose of estimating 2003 or 2004 margins.**

> ANDREW WOLLACK: Right. **And just to put this to bed, I mean, you don't think, there has been any kind of permanent mix change downwards for this company as a result of what's happened in the economy in your - - and your move toward more public sector?**

> FRANK MACINNIS: Absolutely not. **We have reacted to what the markets are giving us. You can see from the backlog chart that the proportion of our backlog represented by private sector commercial construction is probably at 15 or maybe 16% right now**....

> *          *          *

> RAYMOND CHEUNG, ANALYST, LEHMAN BROTHERS: Good morning, guys. **My first question is that I understand you don't have to do a swear in into the gross margin for the second half this year compared to last year, but, yet, you did incorporate some sort of up take in terms of the gross margin quarter over quarter.** Was that primarily to do with the accounting pressure or did you pick up in terms of the settling margins particularly the mechanical side.

> FRANK MACINNIS: What I took into account, Ray, is what we always do. We always perform a better - - perform better as the year goes along. Risks are identified and quant fight [sic] and dealt with in the early stages of construction and service contracts. Efficiency improves, productivity improves, conservatism with respect to recognition of both income and revenue is relaxed as information gets better, as

-28-

assumptions before more valid and it is just a fact that over the last - - almost the entire history of our company, at least under this administration, we have performed better in the second half of the year than in the first half for all those reasons.  And our assumptions are merely the same ones that have - - that have taken place in the company every year since I have been here.  That is that we do better in the second half for although [sic] foregoing reasons.  So when I say that I think that things will improve in the second half, I am not saying the markets will give us anything better than what they have been giving us so far, I am saying that we will do better with what we have got because we always do.

RAYMOND CHEUNG: **In terms of the backlog, can you comment on the margin associated with overall backlog dollars and also can you give us a rough sense how much of the backlog numbers are related to facility services?**

FRANK MACINNIS: With respect to margins in backlog, I'll make a general comment that you might take in conjunction with one that I made in answer to an earlier question.  **Our backlog on the construction side consists of a larger than usual proportion of public and quasi public sector companies.**

DAVID HERMAN: Thanks for taking my call.  A couple quick questions.  I guess the first thing is the backlog.  Can you help me understand what it would look like about a year ago in terms of private versus public sector?

FRANK MACINNIS: **A year ago.  I don't think they would be enough to worry about.  What you're missing perhaps is not in backlog at all.  The revenue and more to the point the profit impact associated with this quarter's results was from projects that typically don't get into the backlog schedule because they are a small, fast moving project, under $250,000 that we typically don't report as part of backlog, but that contribute disproportionately to the profitability of the company in ordinary times and didn't contribute to the profitability of the company in the second quarter so that really is the crux of the message I am trying to get across.  Our backlogs performed routinely....** The quarter I thought it was appropriate in all the circumstances.  Leaving aside the uk.  What I - - what affected us disproportionately was the absence of those contracts outside the backlog report.  That typically SUPPLEMENTS our earnings from backlog projects.

FRANK MACINNIS: Yes.  And I think that implicit - - and I'll make it explicit it in - - in my au summings - - assumptions is **there won't be an improvement for the remainder of the year and we nonetheless state our earnings**.  (Emphasis added.)

41.    For the reasons stated above, these statements were false and misleading when issued

and Defendants either directly issued these statements or acquiesced to these misrepresentations by sitting idly by while they were in possession of material information that specifically contradicted these representations.

42.     Although as a result of Defendants' belated disclosure of certain (albeit incomplete and misleading itself) material information regarding the Company's true performance, EMCOR's common stock traded down to as low as $39.79 in the days following the Company's July 24, 2003 announcement, as a result of Defendants' assurances to the market, EMCOR's common stock continued to trade between $40.20 and $46.31 over the next several months until the Company's shocking announcement after the market closed on October 2, 2003 (described below).

43.     EMCOR and the Individual Defendants allowed the investing public to rely upon these false and reckless representations regarding the Company's financial performance throughout the remainder of July, August and September, 2003 even though they knew that even these revised financial results and, specifically, the annual earnings guidance that EMCOR had provided to the investing public was unattainable absent a dramatic change in the Company's business mix and profitability – which none of the Defendants expected or had any good faith basis to expect or rely upon.

44.     During August, 2003, several members of the Board of Directors of EMCOR took advantage of these false and reckless misrepresentations and sold their EMCOR stock, reaping proceeds of over $421,000.  All of these insider sales occurred on August 15, 2003: (a) David Brown, a Director of EMCOR, took advantage of the artificial inflation of EMCOR stock and sold 3,000 shares of EMCOR stock at artificially inflated prices as high as $42.26 per share, reaping net insider

trading proceeds of more than $75,167; (b) Richard F. Hamm, Jr., Director of EMCOR, took advantage of the artificial inflation of EMCOR stock and sold 6,828 shares of EMCOR stock at artificially inflated prices as high as $41.75 per share, reaping net insider trading proceeds of more than $173,468; and (c) Stephen W. Bershad, Director of EMCOR, also took advantage of the artificial inflation of EMCO stock and sold 6,828 shares of EMCOR stock at artificially inflated prices as high as $41.75 per share, reaping net insider trading proceeds of more than $173,468.

45.     In September, 2003, in recognition of its poor performance in attracting high profit margin business, the Company launched its first ever advertising campaign in an effort to recapture the more profitable, private sector business that it had failed to obtain. EMCOR's belated action in attempting to increase its private sector business portended shocking disclosures regarding the Company's true profitability.

## THE TRUTH ABOUT EMCOR IS BELATEDLY REVEALED

46.     On October 2, 2003, EMCOR literally shocked the market by again lowering its earnings guidance for 2003. Specifically, in a press release published nationally over *Business Wire* on October 2, 2003 after the market closed, the Company belatedly communicated the following information to the market:

> EMCOR Group, Inc. Announces Anticipated Results for the Second Half of 2003; Updates 2003 Full-Year Guidance
>
> EMCOR Group, Inc. (NYSE:EME) today provided financial guidance for the second half of 2003 and updated its financial guidance for the 2003 full-year period.
>
> Based on current market conditions, the Company expects revenue for the second half of 2003 to be between $2.25 billion and $2.35 billion, and diluted earnings per share to be between $0.90 and $1.01. The Company expects these results to be slightly

weighted towards the 2003 fourth quarter.  In light of these expectations, the Company's guidance for the 2003 full-year period is for revenue of between $4.4 billion and $4.6 billion, in light with previous estimates, and diluted earnings per share of between $1.65 and $1.75.  Contract backlog at September 30th, 2003 is anticipated to be approximately $3.1 billion versus $2.9 billion as of 9/30/02 and 12/31/02. EMCOR expects to release its financial results for the third quarter of 2003 on October 23, 2003.

The Company's financial guidance reflects continued solid revenue growth as a result of its leading position in its markets, and profitable results from all the Company's North American operations.  However, **gross profits continue to be restrained by the high proportion of public sector work within backlog, continued recessionary conditions in most of EMCOR's markets, especially in the Midwestern and Northeastern U.S., and a reduced level of private sector, discretionary, small project work, which typically generates higher gross margins than longer-term work**.  EMCOR's expected results for the second half of 2003 also reflect the impact of the slower than anticipated return to profitability of the Company's U.K. subsidiary, due to reorganization charges at that subsidiary and to U.K. market conditions.

Mr. Frank T. MacInnis, Chairman and Chief Executive Officer of EMCOR Group, stated, "This continues to be a challenging time for EMCOR and its entire industry. While we have been able to maintain our dominant position in many of our markets, mainly through awards of public sector projects, the contracting environment remains recessionary, with many of our private sector clients waiting for clearer signs of a full-fledged economic recovery.  In addition, the anticipated recovery in small-project discretionary spending has been slower and less profitable than anticipated.  In the U.K., our new management team has taken steps to enhance profitability, and although we expect profitable performance from these operations in the second half of this year, before reorganization costs, current conditions in the U.K. market together with reorganization costs will prevent us from attaining our previously announced profitability goals for this business until 2004."  (Emphasis added.)

47.     As a result the shocking disclosure that EMCOR would only earn 50% of the profits as compared to the amount that it had advised the investing public it would earn based upon purportedly conservative assumptions and data in the Company's possession less than three months earlier, EMCOR's common stock literally was hammered.  As *Investor's Business Daily* reported on October 6, 2003: "Emcor dived 20% to 34.79 after the construction and facilities services company

slashed its '03 profit forecast to $1.65-$1.75 a share from $2.90-$3.10...."

48.     In a conference call with securities analysts and investors later that day, EMCOR's management team was unable to offer any credible explanation for this dramatic change in guidance after having already lowered earnings guidance in July, 2004.  As reported by *FD (Fair Disclosure) Wire*, Defendants now admitted the following facts during the October 3, 2003 conference call which belied their prior assertions, as well as their representations regarding the contribution of certain sectors of their business to profitability: (a) "[i]n a nutshell, [EMCOR's] current portfolio of longer-term projects, on which [the Company relies] for basic levels of revenue production and coverage of interest charges and administrative costs, is overweighted towards public sector work, which is less profitable than private sector, commercial, and industrial projects"; (b) "[a] second major factor in [EMCOR's] gross margin performance ... is discretionary small-task private sector work, which is typically excluded from our backlog because of its short-term nature ... and [is] disproportionately important to our gross margin performance, [and] this work is not being performed at gross margin levels that will significantly improve our overall margins"; (c) "[w]hen EMCOR is deprived of access for a lengthy period of time to segments of our markets which typically produce our highest gross margins, our profit performance reversed, the level of which is what we expect for the remainder of 2003"; (d) "[s]mall project work - - by which we mean projects under $250,000, which are always outside of our backlog calculations - - in the past have represented about 25 or 26 percent of our overall revenues [and] [c]urrently, we are looking at that sector producing about 21 percent or so of our revenues"; (e) [the reason that these projects] provide disproportionate amounts of gross margins to [EMCOR's] financial results is that these small-task service operations - - HVAC, service calls and the like - - are frequently provided at

gross margins of 20 or 25 percent, as compared to the 10 or 11 percent baseline level of gross margins

within the backlog projects - - the larger, longer, slower moving projects that provide our base

revenue"; (f) "[t]he public sector represents currently about - - between 60 and 65 percent [of contract

backlog] ... between public and quasi-public entities; and (g) [in December, 2002, the public sector

component of contract backlog] would have been, probably, 5 percent less public [and] [i]f you went

back to December 31, 2000, it would have been significantly less than 50 percent public.

      49.    Perhaps most significantly, during the October 3, 2003 conference call, MacInnis

explicitly admitted that EMCOR had based its earnings guidance provided on July 24, 2003 on

assumptions that its earnings from high margin, private sector small projects or fast turn projects would

return "***in a way that was going to significantly supplement [the Company's] margins***" even

though MacInnis himself disclaimed any assumptions of improved market conditions when he, along

with other EMCOR senior managers, delivered earnings guidance for 2003 less than three months

earlier.  In sum, MacInnis essentially admitted that Defendants' prior statements were false and

misleading when issued and that such statements were knowingly false or, at a minimum, were made

with reckless disregard for facts then in Defendants' possession.  In fact, in stark contrast to his

statements on July 24, 2003, MacInnis now admitted that EMCOR had moved into sectors of work

that fundamentally impacted the Company's profitability:

> FRANK MACINNIS: It could have that.  The fact is that we have been successful and
> profitable in differing markets for a whole long time.  Remember where this
> management came from, Andrew.  It wasn't long after we managed this operation out
> of Chapter 11 reorganization that we began to develop the model that we continue to
> implement today.  **And the fact is that the prolonged recession gave sufficient
> time for the high-margin work that comprised a significant part of our backlog -
> - that is the long-term, substantially profitable commercial work - - to finally**

**substantially disappear from our back log of work, to be replaced by lower-margin, predominately public sector work. And that is where we are today. We have established a different kind of base, if you will, for the bulk of our revenue production**....

DAVID HERMAN: Okay. **I guess the second question goes on to more - - the guidance process and the budgeting process. Two months ago you had reviewed - - revised guidance, which at the time seems conservative. Can you help me understand the process you went through at that time, and now the process you're going through at this time to give guidance for 2004? Is there a bottoms-up approach that you did in July? How do we get comfortable? And what kind of internal reports do you guys get from your divisions? Is there a monthly P&L you're getting from these guys? Is it monthly revenue? Is it daily cash? How do we understand how you guys are giving guidance, and how do you sort of plan the business?** (Emphasis added.)

50.     In this same call, MacInnis also essentially admitted that EMCOR's financial reporting system was sufficiently sophisticated so that the Company and its senior managers are able to review and monitor its financial condition on a daily basis and that, despite his specific disclaimers to the contrary on July 24, 2003, EMCOR's revised earnings guidance for 2003 had been predicated upon the reckless hope that the Company's acquisition of high profit work would somehow return in the second half of 2003 (even though Defendants had no reason to believe that it would as of July 24, 2003 and despite MacInnis selective memory and new, false claim that he had disclosed these assumptions on July 24, 2003):

FRANK MACINNIS: Okay. First of all - - and that's a multifaceted question, so let me give what I hope will be a comprehensive answer.

Everything we do at this company is bottoms-up. We are extraordinarily diverse and decentralized operation. We count on the intelligence and information developed from our field operations to flow efficiently from those more than 140 locations to a group level, where it is interpreted, matched with what we know to be the case from our daily cash reports that we receive, and compare with the operational reports which we're receiving all the time. **This is not one of those companies that waits for the fax**

-35-

**machine to start humming at month-end and give us the results for the month,
which are either surprises or not surprises, as the case might be. We are in
constant communication with these companies, and comparing and triangulating
what they're telling us with the cash reports that we receive every day. I get
about a 10-page report every afternoon at 3:00 talking about the operations of
the company. And when you think about the nature of our balance sheet, the
cash report is really crucial to an understanding of how we are doing, because
with our relatively low depreciable asset base, and therefore relatively low
depreciation amortization, cash flow - - at least making allowance for season
and other typical adjustments - - ought to look a lot like P&L. So we can watch
the cash, hear the operations reports, compare the two, and come up with a
pretty good idea of how things are going.**

And when I did that in July - - taking into account the reports from all the operational
personnel, taking a look at the cash, looking at the investment that we had in various
projects - - **I could see, and stated this on the call, that the second half of the
year would be substantially dependent on the recovery of the UK company; our
acquisition of the high margin HVAC and electrical service work that we hadn't
gotten in the first half of the year, primarily due to both the economy and to
weather-related effect; and also, the profitability - - the return to better
performance of our mechanical operations overall, including the Midwest; and
continuation of profitability of our Northeastern Electrical.** Of those four criteria,
the UK company, as I mentioned earlier, has not recovered as fast as I had hoped or
expected. The mechanical operations will improve in the second half, substantially over
the first half. The electrical will not. And the service work I have already spoken about
at length. It materialized in part in terms of revenue, but at significantly lower margins
than I expected, even as I was speaking in mid-July. (Emphasis added.)

51.     Defendants also were completely unable to offer a credible explanation of why a

changeover in backlog to public sector work was not more predictable and, when questioned on this

subject, simply offered more "double-talk" and unresponsive information by discussing private sector

work that allegedly had performed "poorly" and lower margins that had been achieved in certain public

sector projects:

JEFF ALLEN, ANALYST, SILVERCREST ASSET MANAGEMENT: Good
morning, guys. **You referred to the changeover in the backlog in the electrical
segment to public work from more commercial-type work. I guess I'm just**

-36-

**wondering - - why is that a surprise?  And why couldn't you have anticipated that when you gave guidance on the Q2 conference call?**

FRANK MACINNIS: We had not contemplated that the public work - - and frankly, some of the private sector work that continued to be provided to our customers in the Northeast - - would proceed as poorly as it did.  And it has everything to do with the preceding caller who asked about the inherent risks associated with public sector work. We have seen increasing degrees of intransigence on public sector projects from customers who are either budget-constrained or otherwise indisposed to provide the kind of flexibility and opportunity for earning of premiums that we had previously experienced in the public sector....

52.     In sum, during the October 3, 2003 conference call, as evidenced by their unresponsive answers, inconsistent representations and selective memories, Defendants did little more than confirm their culpability and liability for their material misrepresentations and omissions of fact during the Class Period.

## PLAINTIFF'S CLASS ACTION ALLEGATION

53.     Plaintiff brings this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of himself and all other persons who purchased or otherwise acquired EMCOR common stock and/or other securities during the Class Period (i.e., between April 9, 2003 and October 2, 2003 inclusive).  Excluded from the Class are EMCOR, its subsidiaries and affiliates, the Individual Defendants, members of the immediate families of each of the Individual Defendants, any entities in which any of the Defendants have a controlling interest, and the legal representatives, heirs, successors, predecessors in interest, affiliates or assigns of any of the Defendants.

54.     This action may properly be maintained as a class action as a result of the following facts:

a.     During the Class Period, millions of shares of EMCOR's common stock were

issued and outstanding and were actively traded on the New York Stock Exchange, a liquid, efficient and impersonal trading market.  The members of the Class for whose benefit this action is brought are located throughout the United States, and are so numerous that joinder of all members of the putative Class is impracticable.  Millions of EMCOR shares were publicly traded during the Class Period and, upon information and belief, there are hundreds or thousands of members of the Class;

        b.      Plaintiff's claims are typical of the claims of the other members of the Class, and Plaintiff and all members of the Class sustained damages as a result of the defendants' wrongful conduct complained of herein;

        c.      Plaintiff is a representative party who will fairly and adequately protect the interests of the other members of the Class, and has retained counsel competent and experienced in class action securities litigation.  Plaintiff has no interests antagonistic to, or in conflict with, the Class he seeks to represent;

        d.      A class action is superior to other available methods for the fair and efficient adjudication of the claims asserted herein, because joinder of all members is impracticable. Furthermore, because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to separately redress the wrongs done to them.  The likelihood of individual Class members prosecuting separate claims is remote;

        e.      Plaintiff anticipates no unusual difficulties in the management of this action as a class action; and

        f.      The questions of law and fact common to the members of the Class

predominate over any questions affecting any individual members of the Class.

55.     The questions of law and fact which are common to the Class include, among others:

a.     Whether the federal securities laws were violated by the Defendants' acts as alleged in this Complaint;

b.     Whether the documents, press releases, reports and/or statements disseminated to the investing public and to EMCOR shareholders during the Class Period omitted or misrepresented material facts about the financial condition, business prospects, income and earnings expectations of EMCOR;

c.     Whether Defendants failed to correct previously issued statements that they knew to be false or for which they recklessly disregarded the truth or falsity of such statements;

d.     Whether Defendants failed to disclose material, adverse information at a time when they were in the possession of such information;

e.     Whether the Defendants acted with knowledge or with reckless disregard for the truth in misrepresenting and omitting material facts;

f.     Whether, during the Class Period, the market price of EMCOR common stock and other securities was artificially inflated due to the material misrepresentations and omissions complained of herein;

g.     Whether the Defendants participated in and pursued the common course of conduct complained of herein; and

h.     Whether the members of the Class have sustained damages and, if so, what is the proper measure thereof.

## FRAUD-ON-THE-MARKET DOCTRINE.

56.     Plaintiff relies, in part, upon the presumption of reliance established by the fraud-on-market doctrine.  The market for EMCOR common stock was, at all pertinent times, a liquid and efficient market for, inter alia, the following reasons:

a.     EMCOR met the requirements for listing, and was listed on the NYSE, a highly efficient and liquid market;

b.     As a regulated issuer, EMCOR filed periodic public reports with the SEC;

c.     EMCOR's securities trading volume was substantial during the Class Period;

d.     EMCOR was covered by various securities analysts who wrote reports which were available through various automated data retrieval services;

e.     EMCOR disseminated information on a market-wide basis through various electronic media services, and participated in open conference calls with stock analysts and investors; and

f.     The market price of EMCOR securities reacted rapidly to new information entering the market.

57.     The facts identified above reflect the existence of an efficient market for trading of EMCOR securities and make applicable the fraud-on-the-market doctrine.  Similarly, Plaintiff and the other members of the Class are entitled to a presumption of reliance with respect to the misstatements and omissions alleged in this Complaint.

## DEFENDANTS' DUTIES AND MISCONDUCT.

58.     As officers, directors and/or controlling persons of a publicly-held company whose

common stock is registered with the SEC under the Exchange Act, traded on the NYSE at all pertinent times, and governed by the provisions of the Exchange Act, the Individual Defendants had duty to disseminate accurate and truthful information in a timely manner with respect to the Company's operations, finances, financial condition, revenues, income, earnings and present and future business prospects, to correct any previously issued statements from any source that had become untrue, and to disclose any trends that would materially affect earnings and the present and future financial operating results of EMCOR, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information.

59. During the Class Period, each of the Individual Defendants was a senior executive and/or director of the Company and was privy to confidential and proprietary information concerning EMCOR, its operations, finances, financial condition, revenues, income, earnings and present and future business prospects and regularly received reports regarding the same. As a result of his or her possession of such information, each of the Individual Defendants knew or recklessly disregarded the fact that EMCOR had materially overstated the quality of its financial condition during the Class Period and had not disclosed critical information to the investing public which would have revealed that the Company's prior statements were materially misleading and false. As a result of their Board memberships and/or executive and managerial positions with EMCOR, each of the Individual Defendants had access to adverse non-public information about the Company's operations, finances, financial condition, products, revenues, expenses and earnings via access to internal corporate documents, conversations and connections with other corporate officers and employees, and via reports and other information provided to them in connection with the performance of their duties. In

light of their possession of such information, each of the Individual Defendants knew or recklessly disregarded the fact that the reported and expected financial results of EMCOR were materially overstated during the Class Period.

60. The Individual Defendants, as a result of their positions of control and authority as officers and/or directors of the Company, were able to and did control the contents of the various quarterly reports, SEC filings, press releases and presentations to securities analysts pertaining to the Company. Each of the Individual Defendants was provided with copies of EMCOR's management reports, press releases and SEC filings alleged in this Complaint to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. As a result, each of the Individual Defendants is responsible for the accuracy of the challenged public reports and releases as "group published" information and is, therefore, responsible and liable for the representations contained in those statements.

61. Each of the Individual Defendants is liable as a direct participant in, and a co-conspirator with respect to, the wrongs complained of in this Complaint. In addition, the Individual Defendants, by reason of their status as officers and/or directors of EMCOR and access to material, non-public information, were "controlling persons" within the meaning of Section 20 of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of in this Complaint. As a result of their positions of control, each of the Individual Defendants were able to and did, directly or indirectly, control the conduct of EMCOR's business, the information contained in its filings with the SEC and public statements about its business.

62. During the Class Period, Defendants, individually and in concert, directly and indirectly,

engaged and participated in a continuous course of conduct to misrepresent the results of EMCOR's

operations, and to conceal adverse material information regarding the financial condition and results

EMCOR's operations as specified in this Complaint.  Defendants employed devices, schemes, and

artifices to defraud, and engaged in acts, practices, and the course of conduct described herein in an

effort to increase and maintain an artificially high market price for EMCOR common stock and other

securities.  This included the formulations, making and/or participation in the making of untrue

statements of material facts, and the failure to state material facts necessary in order to make the

statements made, in light of the circumstances under which they were made, not misleading, which

operated as a fraud and deceit upon Plaintiff and the other members of the Class.

## COUNT I

## VIOLATION OF SECTION 10(b) OF THE
## SECURITIES EXCHANGE ACT AND RULE 10b-5 THEREUNDER

63.      Plaintiff incorporates by reference paragraphs 1 through 62 of this Complaint as if set

forth herein at length.

64.      Throughout the Class Period, Defendants, singly and in concert, directly or indirectly,

engaged in a common plan, scheme and course of conduct described herein, pursuant to which they

knowingly or recklessly engaged in acts, transactions, practices and a course of business which

operated as a fraud upon Plaintiff and the other members of the Class; made various false statements of

material facts and omitted to state material facts to make the statements made not misleading to Plaintiff

and the other members of the Class, and employed manipulative or deceptive devices and contrivances

in connection with the purchase and sale of EMCOR common stock and other securities.

65.     The Individual Defendants, as executive officers and/or directors of EMCOR, had actual knowledge of the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth by failing to ascertain and disclose the true facts in the statements made by them or other EMCOR personnel to the SEC and the investing public, including Plaintiff and other members of the Class.

66.     The facts alleged herein compel a strong inference that the Defendants made material false and misleading statements to the investing public with scienter, in that the Defendants knew that the public statements issued or disseminated in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws.

67.     As a result of the foregoing, the market price of EMCOR securities was artificially inflated during the Class Period.  In ignorance of the falsity of the reports and statements, and the deceptive and manipulative devices and contrivances employed by the Defendants, Plaintiff and the other members of the Class relied, to their detriment, on the reports and statements described above and/or the integrity of the market price of EMCOR securities during the Class Period in purchasing the Company's securities at prices which were artificially inflated as a result of the Defendants' false and misleading statements.

68.     Had plaintiff and the other members of the Class known of the material adverse information which the Defendants failed to disclose and/or misrepresented, they would not have purchased EMCOR securities at the artificially inflated prices that they did.

69.     Defendants' dissemination of this false and misleading material information, and their failure to disclose material information that rendered their other statements false and misleading, served only to harm Plaintiff and the other members of the Class who purchased EMCOR securities in ignorance of the financial risk to them as a result of such false and misleading information.

70.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

71.     By reason of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiff and the other members of the Class for the substantial damages which they suffered in connection with their purchase of EMCOR securities during the Class Period.

## COUNT II

### VIOLATION OF SECTION 20(A) OF THE SECURITIES EXCHANGE ACT

72.     Plaintiff incorporates by reference paragraphs 1 through 71 of this Complaint as if set forth herein at length.

73.     During the Class Period, each of the Individual Defendants, by virtue of his or here office or offices at, and/or directorship of EMCOR and his or her specific acts, was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act.

74.     Each of the Individual Defendants' position made him or her privy to, and provided him or her with actual knowledge of, the material facts that EMCOR misrepresented and/or concealed from Plaintiff and the other members of the Class during the Class Period.

75.     Each of the Individual Defendants had the power and influence, and exercised the same, to cause EMCOR to engage in the unlawful conduct and practices complained of herein by causing the Company to disseminate the false and misleading information identified above.

76.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

77.     By virtue of the conduct described above, Defendants are liable to Plaintiff and the other members of the Class for the substantial damages that they suffered in connection with their purchase of EMCOR common stock and other securities during the Class Period.

WHEREFORE, Plaintiff, on behalf of himself and the other members of the Class, demands judgment against Defendants as follows:

a.     Determining that this action is properly maintainable as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

b.     Certifying Plaintiff as the Class Representative and his counsel as Lead Class Counsel;

c.     Declaring and determining that the Defendants violated the federal securities laws by reason of their conduct as alleged herein;

d.     Awarding monetary damages against all of the Defendants;

e.     Awarding Plaintiff the costs, expenses, and disbursements incurred in prosecuting this action, including reasonable attorneys' fees and other recoverable expenses of litigation; and

f.     Awarding Plaintiff and the other members of the Class such other and further

relief as the Court may deem appropriate and just under all of the circumstances.

## **JURY DEMAND**

Plaintiff demands a trial by jury.


DATED:   March 31, 2004                _____

James E. Miller
Federal Bar I.D. No.: CT-21560
SHEPHERD, FINKELMAN, MILLER & SHAH, LLC
One Lewis Street
Hartford, CT   06103
(Tel)(860) 246-0600
(Fax)(860) 246-0700
(E-mail) jmiller@sfmslaw.com

James C. Shah
SHEPHERD, FINKELMAN, MILLER & SHAH, LLC
35 East State Street
Media, PA 19087
(Tel)(610) 891-9880
(Fax)(610) 891-9883
(E-mail) jshah@sfmslaw.com

Lauren S. Antonino
Nichole T. Browning
CHITWOOD & HARLEY, LLP
2300 Promenade II
1230 Peachtree Street, N.E.
Atlanta, GA 30309
Telephone:  404/873-3900
Facsimile: 404/876-4476
(E-mail) lsa@classlaw.com



Jack Landskroner
LANDSKRONER GRIECO LLP
1360 West 9th Street
Suite 200
Cleveland, OH 44113

Telephone: 216/522-9000
Facsimile: 216/522-9007
www.landskronerlaw.com

**Attorneys for Plaintiff**