# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

EMCOR GROUP, INC.
SECURITIES LITIGATION

No. 3:04-CV-00531 (JCH)

August 31, 2004

## DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

### <u>Oral Argument Requested</u>

Laurie B. Smilan, *pro hac vice*
     Fed. Bar. No. ct25966
Michele E. Rose, *pro hac vice*
     Fed. Bar. No. ct25917
LATHAM & WATKINS LLP
11955 Freedom Drive
Reston, Virginia  20190
(703) 456-1000 (phone)
(703) 456-1001 (fax)

David A. Becker, *pro hac vice*
LATHAM & WATKINS LLP
     Fed. Bar. No. ct26142
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200

Heidi H. Zapp, Esq.
     Fed. Bar No. ct24655
Jeffrey J. Vita, Esq.
     Fed. Bar No. ct08036
Saxe Doernberger & Vita, P.C.
1952 Whitney Avenue
Hamden, CT 06517
(203) 287-8890

*Attorneys for Defendants EMCOR Group, Inc., Frank T. MacInnis, Leicle E. Chesser and Mark A. Pompa*

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS.........................................................................................................i

TABLE OF AUTHORITIES................................................................................................iii

INTRODUCTION ...............................................................................................................1

FACTUAL BACKGROUND ...............................................................................................2

ARGUMENT ......................................................................................................................9

I.      THE LEGISLATIVE PURPOSE AND REQUIREMENTS OF THE REFORM
        ACT REQUIRE DISMISSAL OF THE COMPLAINT. ....................................................9

II.     EMCOR'S FORWARD-LOOKING STATEMENTS – WHICH CONSTITUTE
        THE CORE OF PLAINTIFF'S CASE – ARE NOT ACTIONABLE AS A
        MATTER OF LAW ..............................................................................................11

        A.     The Reform Act's "Safe Harbor" Provision Protects EMCOR's Forward-
               Looking Statements From Liability.......................................................... 13

               1.     The Statements And Assumptions Challenged By Plaintiff Are
                      Forward-Looking .......................................................................... 13

               2.     EMCOR Provided Abundant Meaningful Cautionary Statements
                      And Risk Disclosure ..................................................................... 15

        B.     EMCOR's Forward-Looking Statements Are Inactionable Under The
               Bespeaks Caution Doctrine ..................................................................... 19

III.    PLAINTIFF FAILS TO PLEAD AN ACTIONABLE OMISSION................................... 20

IV.     THE COMPLAINT FAILS TO PLEAD PARTICULARIZED FACTS GIVING
        RISE TO A STRONG INFERENCE OF SCIENTER.................................................... 22

        A.     Plaintiff Fails To Identify Any Motive Sufficient To Support A Strong
               Inference – Or Any Inference – Of Scienter As To Any Defendant .................. 23

               1.     Defendants' Failure To Profit From The Alleged Fraud Negates
                      Any Inference Of Scienter ............................................................. 23

               2.     Plaintiff Offers No Other Motive Sufficient To Infer Scienter ............... 25

B.      Plaintiff Fails To Allege Specific Facts That Constitute Strong Circumstantial Evidence That Defendants Had Actual Knowledge That Their Earnings Predictions Could Not Be Achieved ........................................... 26

       1.      The Mere Fact that EMCOR's Forecasts Did Not Come To Fruition Is Insufficient to Give Rise to Any Inference of Scienter ........... 27

       2.      Mr. MacInnis' Post-Mortem Statements Concerning Backlog Mix And Late And Less Profitable HVAC Work In No Way Demonstrate Actual Knowledge That EMCOR's Forecasts Would Not Be Achieved ..................................................................................... 28

IV.    PLAINTIFF FAILS TO PLEAD PARTICULARIZED FACTS THAT THE EARNINGS PREDICTIONS WERE FALSE WHEN MADE ....................................... 33

    A.      Plaintiff's Group Pleading Allegations Fail ........................................ 34

    B.      Plaintiff's Conclusory Allegations Are Insufficient To Demonstrate That The Earnings Predictions Were Fraudulent ......................................... 35

    C.      Conclusory Allegations Of EMCOR's Internal Reporting System Are Insufficient ............................................................................. 36

    D.      Plaintiff Fails To Sufficiently Describe His Sources Or Provide Particularized Facts .............................................................................. 37

V.     DEFENDANTS' STATEMENTS OF PUFFERY AND HISTORICAL FACT ARE NOT ACTIONABLE AS A MATTER OF LAW .................................................... 39

CONCLUSION ........................................................................................................ 40

## **TABLE OF AUTHORITIES**

### **CASES**

*Acito v. IMCERA Group, Inc.*,
    47 F.3d 47 (2d Cir. 1995) ........................................................................................ 24

*Alteram S.A. v. Beacon Hill Asset Mgmt. LLC*,
    No. 03 Civ. 2387 (LAK), 2004 U.S. Dist. LEXIS 2927 (S.D.N.Y. Feb. 27, 2004) ......... 35

*Brass v. American Film Technologies, Inc.*,
    987 F.2d 142 (2d Cir. 1993) ...................................................................................... 3

*Chill v. General Electric Co.*,
    101 F.3d 263 (2d Cir. 1996) ..................................................................................... 25

*DiLeo v. Ernst & Young*,
    901 F.2d 624 (7th Cir. 1990) .................................................................................... 26

*Double Alpha, Inc. v. Mako Partners, L.P.*,
    No. 99 Civ. 11541 DC, 2000 WL 1036034 (S.D.N.Y. July 27, 2000) ........................... 34

*Elliott Assocs., L.P. v. Covance, Inc.*,
    No. 00 Civ. 4115 (SAS), 2000 U.S. Dist. LEXIS 17099 (S.D.N.Y. Nov. 28, 2000) ....... 34

*Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*,
    353 F.3d 1125 (9th Cir. 2004) .................................................................................. 12

*Feasby v. Industri-Matematik International Corp.*,
    No. 99 Civ. 8761 (LTS)(JCF), 2003 WL 22976327 (S.D.N.Y. Dec. 19, 2003)......... 38, 40

*Ferber v. Travelers Corp.*,
    785 F. Supp. 1101 (D. Conn. 1991) .......................................................................... 34

*Ferber v. Travelers Corp.*,
    802 F. Supp. 698 (D. Conn. 1992) ............................................................................ 21

*Freedman v. Value Health, Inc.*,
    Nos. 3:95CV2038 JCH, 3:97CV2711, 2000 WL 630916 (D. Conn. Mar. 24,
    2000).................................................................................................................. 27, 32

*Garcia v. United States*,
    469 U.S. 70 (1984)................................................................................................... 9

*GSC Partners CDO Fund v. Washington*,
    368 F.3d 228 (3d Cir. 2004) ............................................................................... 10, 26

*Halperin v. eBanker USA.COM, Inc.*,
    295 F.3d 352 (2d Cir. 2002) ...................................................................... 19

*Harris v. Ivax Corp.*,
    182 F.3d 799 (11th Cir. 1999) ............................................................. 13, 16

*Herschfang v. Citicorp*,
    767 F. Supp. 1251 (S.D.N.Y. 1991) ........................................................... 28

*I. Meyer Pincus & Associate v. Oppenheimer & Co.*,
    936 F.2d 759 (2d Cir 1991) ........................................................................ 19

*In re Advanta Corp. Securities Litigation*,
    180 F.3d 525 (3d Cir. 1999) ....................................................................... 28

*In re Aegon N.V. Securities Litigation*,
    No. 03 Civ. 0603, 2004 WL 1415973 (S.D.N.Y. June 23, 2004) ........................... *passim*

*In re American Express Co. Securities Litigation*,
    *No. 02 Civ. 5533(WHP)*, 2004 WL 632750 (S.D.N.Y. Mar. 31, 2004) ........................... 14

*In re Ascend Commun. Securities Litigation*,
    No. CV 97-8861 NW, 1999 U.S. Dist. LEXIS 20716 (C.D. Cal. Feb. 2, 1999) ............. 22

*In re Bristol-Myers Squibb Securities Litigation*,
    312 F. Supp. 2d 549 (S.D.N.Y. 2004) ......................................................... 34

*In re CIENA Corp. Securities Litigation*,
    99 F. Supp. 2d 650 (D. Md. 2000) ................................................... 18, 22, 27

*In re Citigroup, Inc. Securities Litigation*,
    No. 02 Civ. 5779 (LTS)(RLE), 2004 U.S. Dist. LEXIS 15731
    (S.D.N.Y. Aug. 10, 2004) ...................................................................... 23, 33

*In re Copper Mountain Securities Litigation*,
    No. C-00-3894-VRW, 2004 WL 725204 (N.D. Cal. Mar. 30, 2004) ........................... 13

*In re Cross Media Marketing Corp. Securities Litigation*,
    314 F. Supp. 2d 256 (S.D.N.Y 2004) ..................................................... 12, 17, 34

*In re Crystal Brands Securities Litigation*,
    862 F. Supp. 745 (D. Conn. 1994) .............................................................. 28

*In re Duane Reade Inc. Sec. Litig.*,
    No. 02 Civ. 6478(NRB), 2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003) ............... *passim*

*In re Flag Telecom Holdings, Ltd. Securities Litigation*,
    308 F. Supp. 2d 249 (S.D.N.Y. 2004) ................................................................ 38, 39

*In re IBM Corporate Securities Litigation*,
    163 F.3d 102 (2d Cir. 1998) ........................................................................ 40

*In re Keyspan Corp. Securities Litigation*,
    NO. 01 CV 5852(ARR), 2003 WL 1702279 (E.D.N.Y. Mar. 21, 2003) ........................ 34

*In re Loral Space & Communications Ltd. Securities Litigation*,
    No. 01 Civ. 4388 (JGK), 2000 WL 376442 (S.D.N.Y. Feb. 27, 2004) .................... 22, 34

*In re MSC Industrial Direct Co., Inc. Securities Litigation*,
    283 F. Supp. 2d 838 (E.D.N.Y. 2003) ............................................................ 38

*In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation*,
    272 F. Supp. 2d 243 (S.D.N.Y. 2003) ............................................................ 24

*In re Nokia Corp. Securities Litigation*,
    No. 96 CIV. 3752(DC), 1998 WL 150963 (S.D.N.Y. Apr. 1, 1998) ........................ 36, 39

*In re Northern Telecom Ltd. Securities Litigation*,
    116 F. Supp. 2d 446 (S.D.N.Y. 2000) .......................................................... 24, 27

*In re Party City Securities Litigation*,
    147 F. Supp. 2d 282 (D.N.J. 2001) .............................................................. 13

*In re Silicon Graphics, Inc. Securities Litigation*,
    183 F.3d 970 (9th Cir. 1999) ...................................................................... 36

*In re Staffmark, Inc. Securities Litigation*,
    123 F. Supp. 2d 1160 (E.D. Ark. 2000) .......................................................... 25

*In re Sun Healthcare Group, Inc. Securities Litigation*,
    181 F. Supp. 2d 1283 (D.N.M. 2002) ............................................................ 40

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001) .............................................................. 9, 22, 26

*Karacand v. Edwards*,
    53 F. Supp. 2d 1236 (D. Utah 1999) ............................................................ 12

*Kowal v. MCI Communications Corp.*,
    16 F.3d 1271 (D.C. Cir. 1994) .................................................................... 32

*Laskar v. New York State Electric & Gas Corp.*,
 85 F.3d 55 (2d  Cir. 1990) ........................................................................ 39

*Leventhal v. Tow*,
 48 F. Supp. 2d 104 (D. Conn. 1999) ..........................................21, 24, 26, 29

*Novak v. Kasaks*,
 216 F.3d 300 (2d Cir. 2000) ...................................................................... 37

*Pfeiffer v. Goldman Sachs & Co.*,
 No. 02 Civ. 6912 HB, 2003 WL 21505876 (S.D.N.Y. June 30, 2003)............................ 33

*Phillips v. LCI International, Inc.*,
 190 F.3d 609 (4th Cir. 1999) ..................................................................... 29

*Ressler v. Liz Claiborne, Inc.*,
 75 F. Supp. 2d 43 (E.D.N.Y. 1999)................................................................ 28

*Rombach v. Chang*,
 355 F.3d 164 (2d Cir. 2004) ............................................................. *passim*

*Salinger v. Projectavision, Inc.*,
 934 F. Supp. 1402 (S.D.N.Y. 1996)................................................................ 25

*San Leandro Emergency Medical Group Profit Sharing Plan*,
 75 F.3d 801 (2d Cir. 1996) ............................................................. 24, 36, 39

*Serabian v. Amoskeag Bank Shares, Inc.*,
 24 F.3d 357 (1st Cir. 1994)....................................................................... 37

*Shields v. Citytrust Bancorp, Inc.*,
 25 F.3d 1124 (2d Cir. 1994) ............................................................24, 27, 32, 40

*Southland Securities Corp. v. INSpire Insurance Solutions Inc.*,
 365 F.3d 353 (5th Cir. 2004) ..................................................................... 34

*Vogel v. Sands Brothers & Co. Ltd.*,
 126 F. Supp. 2d 730 (S.D.N.Y. 2001)................................................................ 33, 36

**STATUTES**

The Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 et seq. ........................ 9

15 U.S.C. § 78u-4(b)(1) .......................................................................... 11, 33

15 U.S.C. § 78u-4(b)(2) .......................................................................... 11, 33

15 U.S.C. § 78u-4(b)(3)(A) ............................................................................................... 11

15 U.S.C. § 78u-5(c)(1) .................................................................................................... 10

15 U.S.C. § 78u-5(c)(1)(A) ............................................................................................... 10

15 U.S.C. § 78u-5(c)(1)(A)(i) ........................................................................................... 12

15 U.S.C. § 78u-5(c)(1)(B) ............................................................................................... 22

15 U.S.C. § 78u-5(i)(1) ..................................................................................................... 13

15 U.S.C. § 78u-5(i)(1)(A) ............................................................................................... 12

15 U.S.C. § 78u-5(i)(1)(D) ............................................................................................... 12

## OTHER AUTHORITY

Conference Report to Accompany The Private Securities Litigation Reform Act
        of 1995, H.R. Conf. Rep. No. 104-369 (1995), reprinted in
        1995 U.S.C.C.A.N. 730 ............................................................................................. *passim*

## INTRODUCTION

This case is the very sort of fraud-by-hindsight lawsuit that Congress, in enacting the Private Securities Litigation Reform Act ("Reform Act"), meant to eradicate.  Recognizing that public companies were reluctant to provide forward-looking information for fear of being second guessed in hindsight, and also recognizing that management's outlook for the future is the "most valuable" information investors can have, Congress sought to encourage corporate forecasts, particularly those couched in caution, such as those attacked here.  In order to achieve this goal, the Reform Act contains a Safe Harbor, immunizing forward-looking statements from liability if (1) they are accompanied by meaningful cautionary statements, *or* (2) unless the forecast is shown to have been made with "*actual knowledge*" that it could not be achieved.  While the Safe Harbor has virtually eliminated strike suits based on faulty forecasts, it unfortunately did not stop Plaintiff here.

Here, Plaintiff alleges that EMCOR's failure to meet its earnings estimates for 2003 demonstrates that its forecasts were a product of fraud.  According to Plaintiff, EMCOR's profit estimates were fraudulent because EMCOR supposedly did not sufficiently disclose the challenges it faced in 2003, most particularly its reliance on, and the impact of not obtaining, high margin work from the private sector, especially small, unscheduled repair work.  That the Consolidated Amended Class Action Complaint ("Complaint") does not cite a single fact to support these allegations is not surprising.  The disclosures Defendants made throughout the class period, quoted at length in the Complaint itself, belie Plaintiff's allegations.

Both before and throughout the class period, EMCOR warned that 2003 promised to be a challenging year for the Company.  EMCOR made clear that it had an unfavorable backlog mix, was operating in a recessionary economy which showed no signs of recovery, and was experiencing rising costs in an atmosphere where it was doing everything possible to reduce

expenses.  It was against this backdrop that EMCOR provided its guidance for 2003, noting that while a recovery in these areas was not necessary to achieve these estimates, they were premised on an assumption of maintaining the status quo.  Unfortunately for EMCOR, despite its caution, things did get worse.  While its revenue projections did not change and were in fact achieved, it failed to meet its *profit* projections, which it had candidly and conservatively revised downward twice in the class period as virtually every variable broke the wrong way.  This lawsuit followed.

Plaintiff's fraud claims suffer from several fatal defects.  Most fundamentally, Plaintiff's claim fails because all of the information Plaintiff alleges was concealed from the market was disclosed.  EMCOR's ample risk disclosures, including the very risks that Plaintiff claims were concealed, were more than sufficient to prevent any reasonable investor from being misled to believe that EMCOR's forecasts, twice revised, were guarantees.  The fact that EMCOR's forecasts did not come to fruition proves only that they turned out to be wrong, in light of subsequent events that all turned out to be worse than EMCOR expected, and not that the forecasts – which after all were projections based on assumptions – were false when made.

Plaintiff's claims also fail because he does not come close to meeting the Reform Act's stringent pleading requirements, alleging particularized facts giving rise to a *strong inference* that each defendant *actually knew* that EMCOR's forecasts could not be achieved.  Indeed, here, the fact that not a single defendant sold a single share of stock or otherwise benefited from the alleged scheme to inflate EMCOR's stock price, negates any inference of scienter or fraud.  For all of these reasons, this fraud-by-hindsight complaint premised solely on faulty forecasting and not any facts, must be dismissed as the Reform Act requires.

## **FACTUAL BACKGROUND**

EMCOR Group Inc. ("EMCOR" or "the Company"), a Fortune 500 company headquartered in Norwalk, Connecticut, provides specialty mechanical and electrical

construction and facilities services.  Since EMCOR's emergence from bankruptcy in 1994,

EMCOR built a business comprised of more than 70 companies across 140 worldwide locations

that design, build, install, operate, maintain and repair electrical, mechanical, lighting, heating,

security, communications and power generation systems.  EMCOR 2002 10-K, Affidavit of

Heather McPhee, Exh. 1 at I[1]; 2003 Annual Report, Exh. 2, at 5.[2]  In that decade, EMCOR's

annual revenues have steadily grown from $1.6 million to over $4.5 billion in 2003.  The

"disappointing" third quarter of 2003, which triggered the class-ending disclosure, marked the

Company's 33rd consecutive profitable quarter.

EMCOR's business model has been one of "Stability through Diversity," emphasizing

diversification of services, geographies and market sectors.  Transcript of 12/20/02 Conference

Call ("Tr. 12/20/02"), Exh. 3, at 3; AC ¶ 32.  Historically, good results in one segment of its

business compensate for disappointing results elsewhere resulting in stability and profitability in

good times and in bad.  2002 Form 10-K, Exh. 1, at 3; Trs. 12/20/02, Exh. 3, at 3; Tr. 2/26/03,

Exh. 4, at 4.

Despite EMCOR's historic successes, the Company's outlook for 2003 was "unusually

cautious and conservative."[3]  The economic downturn in 2001 and 2002, beginning with the

burst of the market bubble and worsening in the aftermath of 9/11, had a lagging effect on

EMCOR's end-of-the project sectors, such as EMCOR's specialty construction work, which

occurs when construction jobs are 60-70% complete.  Moreover, the Company's conservative

---

[1] Hereinafter, all references to Exhibits shall refer to Exhibits to the Affidavit of Heather McPhee
("Exh. __").
[2] On a motion to dismiss, the court may consider documents attached to the complaint or
incorporated in it by reference, to matters of which judicial notice may be taken, or to documents
either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing
suit.  *See Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) (citing *Cortec Indus.,
Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991)).

[3] Tr. 12/20/02, Exh. 3 at 3.

accounting policy does not recognize revenue on a construction project until EMCOR's work on that project is 20% complete.  Tr. 12/20/02, Exh. 3, at 7; Tr. 4/24/03, Exh. 5, at 2; Tr. 7/24/03, Exh. 6, at 4; 2003 Form 10-K, Exh. 7, at 11-12.  Thus, in 2002, when most of the economy felt the brunt of the recession that began in 2001, EMCOR was still completing lucrative projects for the telecom and power industry.  2002 Form 10-K, Exh. 1 at 12-13; Tr. 4/24/03, Exh. 5 at 12.

Coming into 2003, EMCOR's backlog from the telecommunications and power industry construction boom was dissipating.  Still, EMCOR believed it had done the best with what was available as a result of its diversification by market sector (public projects replaced private sector work), by business segment (as specialty construction declined, demand increased for facilities services), and geographically (*e.g.*, the Midwest based Comfort Systems acquisition).  Tr. 1/27/03, Exh. 8 at 3; Tr. 2/26/03, Exh. 4 at 8.  In reaction to recessionary pressures, private sector businesses downsized and outsourced in order to focus on core competencies resulting in less demand for construction but greater demand for facilities services.  2001 Form 10-K, Exh. 9 at 2; 2002  Form 10-K, Exh. 1 at 2.  Moreover, EMCOR was able to replace its declining telecommunication and power projects with construction work in the public and quasi-public sector (*e.g.*, transportation, healthcare, educational, water and waste treatments projects).  Tr. 1/27/03, Exh. 8, at 3; Tr. 4/24/03, Exh. 5 at 3-4; Tr. 7/24/03, Exh. 6, at 5-6.

While this diversification provided a cushion against the downturn, the Company repeatedly communicated that the "cushion" would not necessarily prevent a decline and that 2003 would indeed be a challenging year.  Even before the year began, Mr. MacInnis warned that "we have seen no sign of the kind of confident capital expenditures on private sector, commercial and industrial properties, which would signal a return to a more balanced portfolio

4

of service opportunities for our company." Tr. 12/20/02, Exh. 3, at 3.[4]  Mr. MacInnis noted that,

as a result, EMCOR's contract backlog going into 2003, although "very high" was "composed of

a disproportionate quantity of relatively slow moving new construction projects in the public

sector." *Id.*

      Mr. MacInnis also made clear that the public sector work in backlog would not only

result in lower contributions to revenue, but would produce much lower margins than had been

obtained from the lucrative private sector work the Company had booked in the past. *Id.* at 11.

Moreover, Mr. MacInnis advised the market that in light of the outlook for lowered backlog

revenues and lower margins, EMCOR was "aggressively reducing administrative costs and

minimizing interest expense." *Id.* at 4.  However, he warned that despite such efforts,

"throughout this recession, we have experienced increases in cost areas, which are outside our

control…." *Id.*  If the implication of all of this for EMCOR's profitability were not plain

enough for market analysts, Mr. MacInnis spelled it out:  "The net result of the foregoing factors

is downward pressure on our gross margins together with upward pressure on our administrative

costs, with no sign so far of the resumption of the kind of high margin private sector work on

which we thrive." *Id.*

      It was against this backdrop that EMCOR provided its guidance for 2003.  It projected

revenue between $4.4 and $4.6 billion, and earnings were projected initially at $4.25 - $4.60 per

---

[4] Mr. MacInnis' warnings were unvarnished and quite specific:  "I think it's useful to discuss
briefly some of the major factors both general and EMCOR-specific which will influence our
company this year and which we took into account in establishing our estimates.  The private,
commercial and industrial sector in the United States and western European economies continues
to be weak as we enter 2003….We see no signs of increased demand for services related to
capital investments by the commercial and industrial sector, although there are some indications
that the markets which declined sharply last year have stabilized….Whether or not the release of
this demand into the services market is contingent on the short decisive Iraqi war, stabilization of
energy prices, or a solution to the [sic] Korea or some other triggering event that remains to be
seen**."**  Tr. 1/27/03, Exh. 8 at 2.

diluted share.  Tr. 1/27/03, Exh. 8 at 3.  The profit projections were noteworthy because even though EMCOR projected, and subsequently achieved, revenues that were $500 million more than those reported for 2002, its projections for earnings were flat to *down*.  These points bear emphasizing, because Plaintiff repeatedly distorts and confuses this important difference, and treats EMCOR's comments regarding revenue and profit projections indiscriminately. EMCOR's revenue projections for 2003 represented a 20% increase over the prior year and those projections did not change and were in fact achieved.  2003 Form 10-K, Exh. 2 at 13.  It was EMCOR's net *profit* projections, as reflected in its earnings per share estimates which were revised downward and that turned out to be, just as EMCOR repeatedly warned, the critical factor in the equation for 2003.

In making its projections, EMCOR told the market that it did not assume that the private sector would recover.  Tr. 1/27/03, Exh. 8, at 2.  But what EMCOR did assume was that with all of the conservative assumptions underlying its forecasts, including a substantial reduction in profitability, things were unlikely to get significantly worse.  EMCOR made explicit, that it did not expect the private sector to recover, but to meet the bottom range of its earnings forecast, EMCOR assumed maintenance of the "status quo" in the market place (which would translate to a status quo in the mix of private and public sector work in its backlog).  *See, e.g., id.* at 3; (AC ¶ 45) ("a flat status quo market on the low end or a modest amount of second half private sector growth at the top end.").

And while it did not expect its integration of CES to be easy, and knew and warned repeatedly that it would be more costly and complicated than any prior acquisition, EMCOR had

a plan for the integration and expected it would be achieved.[5]  There were problems in the UK, but once they were identified, EMCOR thought that they were fixed.[6]  And finally, while EMCOR did not predict unusually warm weather – which would mean earlier construction starts in the winter and more urgent need for HVAC work in early hot spells – it did assume that "the weather [would] perform[] on a mean."  Tr. 2/26/03, Exh. 7 at 7.

Unfortunately for EMCOR, despite its conservatism and caution, things did get worse. Everything broke the wrong way and in unexpected ways.  It was, for EMCOR, the "perfect storm."[7]  The percentage of public and quasi public sector work increased.  Tr. 7/24/03, Exh. 6, at 2-4.  The margins on that work declined.  *Id.*  The private sector market experienced *further* deterioration.  *Id.* at 11.   Certain of EMCOR's key markets, e.g., the Midwest construction market, were not "nimble enough" to make the needed adjustments to compensate for the shift in backlog mix for the long-term.  Tr. 4/24/03, Exh. 5, at 11; Tr. 7/24/03, Exh. 6 at 13.  Because of the pricing pressures of the poor economy, EMCOR Facility Services did not win the large

---

[5] *See* Tr. 1/27/03, Exh. 8 at 4 ("The integration of CES is going to be more difficult, expensive and challenging than the very successful and quick integration of the Comfort Systems company that we purchased in early 2002…."); Tr. 2/26/03, Exh. 7 at 6 ("[T]his is going to be a challenging, potentially difficult and complicated job of integration because, at the same time that we are combining into CES some of our previously-owned facility service companies, we are also and simultaneously integrating CES into EMCOR corporate operations and systems."); Tr. 4/24/03, Exh. 5 at 6 ("[CES integration] was always going to be more extensive and difficult than, for example, the Comfort Systems acquisition in the early part of 2002.").

[6] *See* Tr. 4/24/03, Exh. 5 at 3 ("We're very disappointed in our UK operations, notably on the construction side of that business and will be taking the necessary steps to improve its future performance.); *Id.* at 6 ("The British construction market…has had all the characteristics, including the unfortunate characteristics of some aspect of the construction business, including volatility, and in the British case, reliance on some large projects and with that comes vulnerability to write-downs on large projects that go poorly….The British construction market, in particular, remains a management issue for us that we are working hard to address.").

[7] Mr. MacInnis explained that "second [half] and full year operating results will be the product of a number of moving parts, as usual."  Tr. 4/24/03, Exh. 5 at 12.  Unfortunately, within the next two months, none of those "moving parts" shifted favorably for EMCOR.

contracts that it bid in the spring.  *See* EMCOR Press Release 7/24/03, Exh. 11; Tr. 7/24/03, Exh. 6 at 4, 10.

More problems than originally identified surfaced in the UK requiring additional restructuring and thus expense, and the new contracts that were inked in early 2003 were cancelled or delayed.  *See* 6/30/03 Form 10-Q, Exh. 10 at 16-27; Tr. 4/24/03, Exh. 5 at 6; Tr. 7/24/03, Exh. 6 at 6.  The integration of CES proved to be more difficult and more expensive and more complicated than EMCOR had predicted.  Tr. 4/24/03, Exh. 5 at 12; Tr. 7/24/03, Exh. 6 at 11.  And, as if things were not bad enough, in 2003 the US experienced the coldest winter in 100 years; Atlanta did not break 90 degrees until July.  *See* Tr. 7/24/03, Exh. 6 at 2; Tr. 10/3/03, Exh. 12 at 18.  When HVAC work did start to pick up in mid-summer when it finally got hot, the margins on that work, since there had been so little of it, were not as EMCOR had predicted.  Tr. 7/24/03, Exh. 6 at 5; Tr. 10/3/03, Exh. 12 at 3.

In sum, EMCOR achieved the revenue projections set at the beginning of the year: It correctly estimated the quantity of work it would take in.  What the Company did not estimate accurately were its gross and net profits or the quality of the work and its internal cost structure.  Tr. 10/3/03, Exh. 12 at 2-3.  Indeed, the very risk that Mr. MacInnis cautioned about even before the year began – "margin pressure" – coupled with unexpected additional operating expenses, e.g., higher CES integration and UK restructuring costs, a *further* decrease in private sector work, and delays due to once-in-a-lifetime weather patterns, caused EMCOR to twice revise its earnings estimates during the year and to twice promptly and candidly disclose that revised guidance to investors.  The day after the Company announced its second earnings estimate revision on October 2, 2003 (after the market closed), EMCOR's stock dropped from $43.40 to

$34.79 on October 3, 2003 (although returning to $43.20 only two months later on 12/9/03; $43.83 on 1/2/04 and $45.06 on 1/5/04).  NASDAQ.com, Exh. 13.

Ultimately, 2003 proved to be a challenging year for EMCOR, but no facts support Plaintiff's assertion that the Company's human fallibility in failing to accurately predict year-end earnings for a far-flung, diverse set of businesses in a quickly changing economic environment, reflects a fraud.  More remarkably, against this backdrop, EMCOR did achieve its  revenue projections and might have made its earnings projections if it had been able to predict the weather as well as its business and business conditions.  In sum, the facts reveal that the Company communicated frankly with the public throughout the year, took difficult steps that will inure to the Company's long term benefit (but "hurt" in the short-term), and admirably weathered a fiscal year that proved to be EMCOR's "perfect storm."

## ARGUMENT

## I.    THE LEGISLATIVE PURPOSE AND REQUIREMENTS OF THE REFORM ACT REQUIRE DISMISSAL OF THE COMPLAINT.

This action is governed by the Private Securities Litigation Reform Act of 1995 ("Reform Act"), 15 U.S.C. § 78u-4 *et seq.*  As its name suggests, and its text and legislative history make clear, the Reform Act was intended to substantially strengthen (hence, "reform") both the liability protections and the pleading requirements in private securities fraud actions like this one.  *See, e.g., Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (Reform Act "imposed heightened pleading requirements for plaintiffs in securities fraud actions.").  Congress enacted the Reform Act to put an end to meritless class actions alleging fraud in the sale of securities which, like the instant case, are "based on nothing more than a company's announcement of bad news, not evidence of fraud," H.R. Conf. Rep. No. 104-369, at 31 (1995), *reprinted in* 1995

U.S.C.C.A.N. 730 ("Conf. Rep."), Exh. 14;[8] *see also GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 246 (3d Cir. 2004) (one of the congressional objectives in enacting the Reform Act was "to provide a filter at the earliest stage (the pleading stage) to screen out lawsuits that have no factual basis."). Of particular concern to Congress was the "chilling effect" such lawsuits were having a on "the willingness of corporate managers to disclose [forward-looking] information to the marketplace." Conf. Rep., Exh. 14, at 42-43. Forecasts of future corporate performance are necessarily educated guesses, not guarantees or statements of current fact. Given the limits of human prescience and the vagaries of complex businesses and economies, forecasts often do not come to pass. Yet because Congress determined that "[u]nderstanding a company's own assessment of its future potential [is] among the most valuable information shareholders and potential investors could have about a firm," it found that securities class actions, brought in the guise of protecting investors, were actually causing great harm. *Id*. at 43.

Thus, Congress enacted several reforms. First, it created a "Safe Harbor" "to provide *certainty* that forward-looking statements will not be actionable by private parties…." Conf. Rep., Exh. 14 at 43-44 (emphasis added); *see also* 15 U.S.C. § 78u-5(c)(1)(A). If accompanied by meaningful cautionary statements, the Safe Harbor *exempts* forward-looking statements from liability. *Id*. Even absent such cautions, because forward-looking statements are predictions which are neither true nor false, Congress also immunized them from liability under the Safe Harbor unless plaintiffs show defendants had *actual knowledge* that the predictions or forecasts could not be achieved. *See* 15 U.S.C. § 78u-5(c)(1); Conf. Rep., Exh. 14, at 43.

---

[8] The Reform Act's Conference Reports are to be afforded great weight because "[t]he authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill, which 'represent the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation.'" *Garcia v. United States*, 469 U.S. 70, 76 (1984) (quoting *Zuber v. Allen*, 369 U.S. 168, 186 (1969)).

Congress also heightened the pleading requirement with respect to all of Plaintiff's allegations, including pleading scienter.  While the Second Circuit has always required that plaintiffs plead scienter with particularity, the Reform Act makes this explicit and *further* requires that these particularized facts must give rise to a "*strong inference*" that each defendant acted with an intent to deceive.  15 U.S.C. § 78u-4(b)(2) (emphasis added).  The Reform Act now also requires that plaintiffs not only "specify each statement alleged to have been misleading," as Rule 9(b) requires, but also specify "the reason or reasons *why* the statement is misleading." Conf. Rep., Exh. 14, at 41; 15 U.S.C. § 78u-4(b)(1) (emphasis added).

These stringent requirements are the Reform Act's enforcement mechanisms, designed to achieve its goal of eliminating fraud-by-hindsight abuses.  They are not mere technicalities.  A complaint that does not meet the Reform Act's heightened pleading standards "shall" be dismissed at the pleading stage.  15 U.S.C. § 78u-4(b)(3)(A).

## II.   EMCOR'S FORWARD-LOOKING STATEMENTS – WHICH CONSTITUTE THE CORE OF PLAINTIFF'S CASE – ARE NOT ACTIONABLE AS A MATTER OF LAW

Plaintiff's action centers on challenges to EMCOR's earnings guidance and the assumptions underlying that guidance for fiscal year 2003.  Plaintiff claims that EMCOR's guidance, forecasts and assumptions, as originally stated at the outset of the class period and then later revised, were somehow false because, ultimately, the assumptions did not materialize, and the forecasts were not achieved.  Even before the Reform Act, such hindsight allegations were routinely rejected.[9]

---

[9] "In enacting the Reform Act, Congress created a statutory version of the bespeaks caution doctrine, the Safe Harbor.  Motivating the codification, Congress found that the existing system of private securities litigation had a 'muzzling effect' on 'the willingness of corporate managers to disclose information to the marketplace' because companies and their officers were subjected to potentially limitless liability if they disclosed projections that later turned out to be

The Reform Act makes this explicit.  As noted, the Safe Harbor immunizes forward-looking predictions from liability because Congress recognized both that such predictions are important to investors and also that they are peculiarly subject to hindsight second-guessing because they often do not come to pass.  Thus the Safe Harbor rewards (by exempting from liability) companies that both publicize their business outlooks and also provide meaningful cautionary disclosures alerting investors that projections are not guarantees.

As demonstrated below, because EMCOR's forward-looking statements were accompanied by meaningful cautionary language and risk disclosure, they are immune from liability under both the Reform Act's safe harbor and the bespeaks caution doctrine.  *See* 15 U.S.C. § 78u-(5)(i)(1)(A), (D).  Accordingly, Plaintiff's claims challenging EMCOR's forecasts must be dismissed.  15 U.S.C. § 78u-5(c)(1)(A)(i); *see also Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) (affirming dismissal of claims based on forward-looking statements because statements "contained sufficient cautionary language to bespeak caution and trigger the safe harbor of the [Reform Act]"); *In re Aegon N.V. Sec. Litig.*, No. 03 Civ. 0603, 2004 WL 1415973, at *12, *14 (S.D.N.Y. June 23, 2004) (dismissing forward-looking statements with cautionary language under safe harbor absent "strong inference of" actual knowledge of falsity); *In re Cross Media Mktg. Corp. Sec. Litig.*, 314 F. Supp. 2d 256, 266 (S.D.N.Y 2004) (granting motion to dismiss; plaintiff's claims about earnings projections "run afoul of the safe harbor provisions of the PLSRA, which make forward-looking statements not actionable"); *In re Duane Reade Inc. Sec. Litig.*, No. 02 Civ. 6478(NRB), 2003 WL 22801416, at *5-6 (S.D.N.Y. Nov. 25, 2003)

---

inaccurate."  *Karacand v. Edwards*, 53 F. Supp. 2d 1236, 1243 (D. Utah 1999) (quoting Conf. Rpt. at 42-43).

(dismissing predictions of "expect diluted earnings per share" because these "predictive statements of opinion" were accompanied cautionary statements).[10]

A.    **The Reform Act's "Safe Harbor" Provision Protects EMCOR's Forward-Looking Statements From Liability**

1.    **The Statements And Assumptions Challenged By Plaintiff Are Forward-Looking**

Consistent with its goal of encouraging forward-looking disclosure, Congress defined forward-looking statements broadly to include projections of future revenues, income, earnings, and other financial items, descriptions of management's plans for future operations, and stated assumptions underlying or relating to any such statements. [11]  *See* 15 U.S.C. § 78u-5(i)(1); *Aegon,* 2004 WL 1415973 at *14 (forward-looking statements include all statements "whose truth cannot be ascertained until some time after the are made") (internal citation omitted). EMCOR's earnings forecasts, and the assumptions underlying those forecasts, are precisely the type of forward-looking statements to which the safe harbor applies.  *See, e.g., Rombach*, 355 F.3d at 172-73 (safe harbor protected defendants' statements regarding expected earnings and the

---

[10] *See also Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.,* 353 F.3d 1125 (9th Cir. 2004) (affirming dismissal of claims based on forward-looking statements regarding successful integration of acquired business because accompanied by meaningful cautions); *In re Copper Mountain Sec. Litig.*, No. C-00-3894-VRW, 2004 WL 725204 (N.D. Cal. Mar. 30, 2004) (dismissing forecasts of future revenues and earnings); *In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 310 (D.N.J. 2001) (predictions of expected sales growth immune from liability when certain "known and unknown risks and uncertainties" were disclosed).

[11] The Reform Act defines "forward-looking statement" as "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items," and "any statement of the assumptions underlying or relating to any statement described in subparagraph A, B or C". Moreover, mixed statements of prediction and present fact are forward-looking. *See, e.g., Harris v. Ivax Corp.*, 182 F.3d 799, 806-07 (11th Cir. 1999) ("[W]ere we to banish from the safe harbor lists that contain both factual and forward-looking factors, we would inhibit corporate officers from fully explaining their outlooks.  Indeed, liability-conscious [corporate] officers would be relegated to citing only the factors that could individually be called forward-looking.  That would hamper the communication that Congress sought to foster.").

assumptions underlying those statements); *In re Am. Express Co. Sec. Litig.*, No. 02 Civ.

5533(WHP), 2004 WL 632750, at *11 (S.D.N.Y. Mar. 31, 2004) (dismissing statement that

"'American Express would meets its 12-15% earning per share targets by year end,' clearly a

projection of earnings within the safe harbor").  Such statements by EMCOR include:

- "**Based on our current outlook**, I'm please to reiterate 2003 revenue and earnings guidance to the market at levels of $4.6 billion of revenue and $4.25 to $4.60 earnings per share." (AC at ¶ 4); (emphasis added)

- "[M]y **underlying assumption** with respect to the lower end or base case per our guidance – that is, $4.4 billion of revenue and $4.25 per share – **does not assume** any improvement in the private sector for the remainder of this year." (AC at ¶ 4, 6); (emphasis added);

- "We **expect second half revenue to be similarly strong** at levels of 2.2 to 2.4 billion dollars, and we reiterate for year 2003 revenue guidance of 4.4 to 4.6 billion dollars. **We also expect our contract backlog balance to remain strong**."  (AC at ¶ 5) (emphasis added)

- "When [the CES] integration is completed, **we will leverage** our $1 billion position in the growing facilities services market to drive revenue growth and operating efficiencies."  (AC at ¶ 51) (emphasis added);

- Well, I think that **we are going to get back to** our normal profitability **this year due to a number of factors**, one of which **will be** the good performance of our facilities service business, even if we continue to anticipate weakness in some sectors of the private market.  As I mentioned during the last conference call, **my underlying assumptions** with respect to the lower end or base case per our guidance – that is $4.4 billion of revenue and 4.25 per share – **do not assume any improvement in the private sector for the remainder of this year**.  (AC at ¶ 60) (emphasis added)

- "**Looking ahead**, we see little evidence of any short-term improvement in the private sector commercial market….[W]e are…reiterating revenue **guidance for 2003** of between $4.4 billion to $4.6 billion, **especially in light of** our strong year to date revenue and backlog performance, **we currently expect** diluted earnings per share for the 2003 full-year period to be in the range of $2.90 - $3.10."  (AC at ¶ 65); (Tr. 7/24/03 at 4) (emphasis added.)

These are precisely the type of forward-looking predictions the Reform Act intended to protect.[12]

### 2. EMCOR Provided Abundant Meaningful Cautionary Statements And Risk Disclosure

In the instant case, EMCOR provided meaningful cautionary language candidly disclosing the risks to achieving, and uncertainties inherent in, its forecasts. The Company's press releases, conference calls, and SEC filings which Plaintiff challenges warned that EMCOR's forecasts were based on assumptions and perceptions of historical trends, current conditions and expected future developments and other factors and, as such, were subject to risks and uncertainties. *See* Appendix A: Cautionary Language, Exh. 15. The Company went on to warn that "economic and business conditions [and future] business opportunities could cause actual results to differ materially from those anticipated in the statements." *See id.* The Company also warned of more specific risks associated with its business, including:

- "changes in the markets for EMCOR's services;"
- "adverse changes in general market conditions;"
- "decreased or lack of growth in the mechanical and electrical construction and facilities services industries;"
- "increased competition, pricing pressures, risks associated with foreign operations;"
- "market risk and its potential related impact on accounts receivable or costs and estimated earnings in excess of billings on uncompleted contracts;" and
- "market risks for changes in interest rates for borrowing under its Revolving Credit Facility."

*See* 2002 Form 10-K, Exh. 1 at 19-20; 2003 Form 10-Q, Exh. 7 at 19-20 (*See* Appendix A: Chart of Cautionary Language, Exh. 15).

---

[12]     A complete list of the forward-looking statements challenged by Plaintiffs appears at Appendix B: Challenged Forward-Looking Statements, Exh. 16.

The Company's warnings did not stop there.  In conference calls during which the challenged guidance was given, Mr. MacInnis continued to update and remind the market of the many challenges and risks facing the Company, highlighting some of the specific risks that ultimately came to fruition and contributed to EMCOR's disappointing 2003 results.[13]  For example, even before the purported Class Period EMCOR identified significant challenges that the Company would face in 2003.  Thus, going into 2003, EMCOR warned investors of the significant risks it faced all of which could affect its ability to meet its forecasts:

- "[O]ur contract backlog [i.e., the pipeline of *future work*]…is composed of a disproportionate quantity of relatively slow moving new construction projects in the public sector, meaning the backlog will contribute a lower percentage of our 2003 revenues than have been the case in past years." (emphasis added)

- "[W]e have seen…no sign of…a return to a more balanced portfolio of service opportunities for our company."

- "[W]e have experienced increases in cost areas, which are outside our control."

- There is "downward pressure on our gross margins together with upward pressure on our administrative costs, with no sign…of the resumption…of high margin private sector work."

- "[A] lot depends on what part of the construction sector [new projects appears] in. If it appears in the form of…public sector…relatively slow moving…construction projects…there is very little premium to be earned, [and we will be] disproportionately affected by our conservatism in that we don't recognize profits on contracts until they are 20% complete."

Tr. 12/20/02, Exh. 3, at 3-7.

- "The private, commercial and industrial sector in the United Sates and western European economies continues to be weak."

---

[13] In noting that EMCOR warned of some of the actual risks that came to pass, it bears noting that, just as certainly as Congress intended to protect companies from liability for failing accurately to predict future fortunes, it also did not require them to accurately predict the risks that might cause their business forecasts not to come to pass.  *See* Conf. Rep., Exh. 14, at 44 ("Failure to include the particular factor that ultimately causes the forward-looking statement not to come true will not mean that the statement is not protected by the safe harbor."); *see also Harris v. Ivax,* 182 F.3d at 807 (cautionary statement need not "explicitly mention the factor that ultimately belies a forward-looking statement").

- We see no signs of increased demand for services related to capital investments by the commercial and industrial sector."

- "Whether or not the release of…demand [by the private sector] into the services market is contingent on the [resolution of] the…Iraqi war, stabilization of energy prices, or a solution to Korea or some other triggering event…remains to be seen."

- "The integration of CES is going to be…difficult, expensive and challenging…because we acquired a substantial administrative structure and overhead with the CES companies."

Tr. 1/27/03, Exh. 8, at 2-4.

In July (mid-way through the purported Class Period), Mr. MacInnis continued

to update the market concerning some of these same challenges and risks, for example:

- [With respect to CES] there will be ongoing structural issues associated with physical integration, management, reordering and the like. (Tr. 7/24/03, Exh. 6, at 9);

- [There's still] general margin pressure (*id.* at 8);

- In the UK, for example…our transportation project[s] [booked] in the first quarter…are still at an early stage…their cost characteristics and ultimate profitability are not clear. [*Id.* at 6].

These sobering cautionary statements are precisely the type of meaningful risk

disclosures that courts have found the Reform Act's safe harbor contemplates. *See*, *e.g.*,

*Rombach*, 355 F.3d at 172-73 (cautionary language that "total revenue…decreased by 25 percent

in the [2nd] quarter," and that the company "disappointed at the contribution of many…recently

acquired sites this quarter, [but was]…working hard to complete the integration of [these sites]"

defeated a securities fraud claim (alterations in original)); *Cross Media*, 314 F. Supp. 2d at 266-

68 ("Excerpts from the press releases and [SEC filings] [quoted by plaintiffs]" contained ample

cautionary language warning of "numerous specific factors that could materially affect those

forward-looking statements."); *Duane Reade*, 2003 WL 22801416, at *6 (attack on forward-

looking statements failed because "defendants released specific cautionary statements regarding front-end sales, new store opening costs and inventory shrink.").[14]

In *Aegon*, for example, Judge Sweet recently granted defendants' motion to dismiss because, inter alia, the challenged forward-looking statements were immune from liability under the Reform Act's safe harbor.  2004 WL 1415973, at *14.  There, like here, plaintiffs challenged as false, among other things, the company's prediction that it was on track to achieve earnings growth of 10% to 15% in 2001 and 2002.  *Id.* at *6.  In dismissing those claims under the safe harbor, Judge Sweet held that warnings nearly identical to those given here insulated the forward-looking predictions from liability, including:

- changes in general economic conditions, particularly in the U.S., the Netherlands and the United Kingdom.;
- changes in performance of financial markets;
- changes in the fair value of and returns earned on its investments;
- decline in the securities markets

*Id.* at *13-14.  Like *Aegon*, EMCOR's abundant cautionary statements immunize its forward-looking statements from liability.  In sum, the statements that Plaintiff challenges in his Complaint are forward-looking statements which were accompanied by meaningful cautionary risk disclosures and thus are immune from liability under the Reform Act's Safe Harbor.  The claims based on the April and July earnings estimates (and the assumptions underlying those predictions), the gravamen of Plaintiff's case, should therefore be dismissed.

---

[14] *See also In re CIENA Corp. Sec. Litig.*, 99 F. Supp. 2d 650, 661 (D. Md. 2000) (predictions of revenue and earnings were forward-looking statements accompanied by meaningful cautionary language, including "actual results could differ materially from those stated or implied," and were thus protected by safe harbor).

**B.      EMCOR's Forward-Looking Statements Are Inactionable Under The
Bespeaks Caution Doctrine**

Even prior to enactment of the Reform Act, the Second Circuit recognized the
impropriety of allowing securities plaintiffs, armed only with the benefit of hindsight, to
challenge forward-looking statements that ultimately proved to be inaccurate.  Under the
judicially-created (and Congressionally endorsed[15]) "bespeaks caution" doctrine, forward-
looking statements are not actionable so long as a company makes meaningful cautionary
disclosures sufficient to alert reasonable investors that the forward-looking statements are
projections, not guarantees.  *See I. Meyer Pincus & Assoc. v. Oppenheimer & Co*., 936 F.2d 759,
761 (2d Cir 1991) (adopting bespeaks caution doctrine, and declining to impose liability where
language read in context "cautions a reasonable investor" and "clearly bespeaks caution"); *see
also Halperin v. eBanker USA.COM, Inc*., 295 F.3d 352, 357 (2d Cir. 2002) (affirming dismissal
of complaint; under the "bespeaks caution" doctrine, defendants' cautionary statements
"considered together and in context," did not mislead investors").

As discussed above, EMCOR accompanied its forward-looking statements with abundant
meaningful risk disclosure, which provided notice that its earning projections were just that –
projections – and not guarantees.  In light of these cautions, a reasonable investor would not have
been misled about the risks associated with the Company's earnings forecasts.  Accordingly, the
bespeaks caution doctrine, in addition to the Reform Act's safe harbor, protects the forward-
looking statements challenged in the Complaint.

---

[15] The Safe Harbor was mean to supplement, not supplant, the bespeaks caution doctrine.  Conf.
Rep. at 46.

### III.   PLAINTIFF FAILS TO PLEAD AN ACTIONABLE OMISSION

Plaintiff also seeks to hold Defendants liable for their supposed failure to disclose (1) that EMCOR's backlog was weighted towards less profitable public sector contracts and that profitability would be impacted if private sector spending did not rebound and (2) the CES acquisition was adversely affecting earnings.  AC ¶¶ 52(a), 56, 57, 58, 70, 72, 81.  These allegations strain credulity, as shown above, since Defendants' class period statements, quoted at length in the Complaint itself, are chock full of such disclosures.

First, as shown, the unfavorable mix of public versus private sector work, and the adverse implications for profitability were a constant refrain.  *See, e.g.,* Tr. 12/20/02, Exh. 3, at 11; (AC ¶ 34) (disclosing that "contract backlog, despite being very high, is composed of a disproportionate quantity of relatively slow moving new construction projects in the public sector" and that this public sector work "is net-net less profitable than comparable private sector work."); Tr. 7/24/03, Exh. 6, at 6; (AC ¶ 56) (noting that backlog was "over-weighted on the side of public sector projects," and explained that "ultimate gross margins on public sector projects are probably a half to a full percentage point lower than corresponding private sector projects over time).[16]

Second, Plaintiff's allegations that Defendants failed to disclose that CES was more difficult to integrate and had lower margin work than had been anticipated and that this negatively impacted the entire facilities group are equally absurd.  AC ¶¶ 72, 81.  Again, as shown, EMCOR repeatedly stated that the CES integration was "difficult," "expensive," and

---

[16] Plaintiff also attempts to mischaracterizes a May 20, 2003 interview with Mr. MacInnis to imply that he concealed EMCOR's profitability goals were dependent upon private sector work. *See* AC ¶ 62.  Contrary to Plaintiff's allegations, during the interview Mr. MacInnis was asked about *revenue* growth and not *profitability*.  *Id.* ("As far as construction revenue, is there one geographic area where you're seeing a faster uptick?"  MacInnis responded that, although there were anecdotal increases in private spending, EMCOR was "still reliant, primarily, on the public and quasi-public sector for our growth.").  Tr. 5/20/03 CNN Interview, Exh. 17.

"challenging,"[17] disclosed the expectation and subsequent fact of "increased selling, general and

administrative expenses" including "increased interest expense as a result of the CES

acquisition," (*see, e.g.*, AC ¶ 51 (quoting EMCOR Apr. 9, 2003 Press Release, Exh. 18),[18] and

disclosed the *actual* performance of its facilities management group in each of its 2003 10-Qs.[19]

It is axiomatic that where allegedly omitted information has been disclosed, Plaintiff has no

claim. *See Ferber v. Travelers Corp.*, 802 F. Supp. 698, 705 (D. Conn. 1992) (disclosure in

Company's annual financial statements negate an omission claim); *Leventhal v. Tow*, 48 F. Supp.

2d 104, 116 (D. Conn. 1999) (claim that defendants failed to disclose the effect and progress of

the company's expansion plans were "wholly without merit" because "the defendants informed

potential investors at the appropriate times that earnings were lower and that the expansion plan

was going to be cut back.").

---

[17] Specifically, the Company disclosed that "the integration of CES will be more challenging and involve more work and perhaps more expense than that associated with Comfort Systems." Tr. 12/20/03, Exh. 3, at 4 (cited by AC ¶ 37). In April, Mr. MacInnis reiterated that "the CES integration would be more difficult and expensive than previous acquisitions" because, among other things, the integration involved "a dual kind of assimilation process that involves organizing CES into EMCOR's systems and organizational structure and at the same time adding EMCOR operations to CES" and noted the "challenging conditions" and increased expenses assumed through the integration of CES. Tr. 04/24/03, Exh. 5, at 2, 3 (cited by, *e.g.*, AC ¶ 4). While, Mr. MacInnis did note that the CES integration had "gone very well," AC ¶ 72, Plaintiff omits other cautionary language describing continued challenges, including expenses and "on going structural issues" associated with integrating CES. *See* Tr. 07/24/03, Exh. 6, at 9.

[18] The Company noted that "[g]eneral administrative costs rose in dollar terms due to the inclusion and integration of CES" and that "[o]perating income and net income [were] affected by the cost of CES integration." Tr. 07/24/03, Exh. 6, at 3. Mr. MacInnis also explained that "[o]ne of the characteristics of facility service is that it attracts a higher proportionate level of general, administrative expense. In part because of the enhanced marketing and sales activities associated with the business compared to construction and in part because of some of the on call nature of the work performed…." Tr. 04/24/03, Exh. 5, at 5.

[19] The first and second quarter 2003 Form 10-Qs reported that operating income for the facilities management business, although higher than same quarter 2002 numbers, was significantly below 2002 pro forma numbers. *See* 6/30/03 Form 10-Q, Exh. 10; 3/31/03 Form 10-Q, Exh. 19.

IV.     **THE COMPLAINT FAILS TO PLEAD PARTICULARIZED FACTS GIVING RISE TO A STRONG INFERENCE OF SCIENTER**

The Complaint suffers from an additional fatal defect:  Plaintiff fails to plead facts giving rise to a *strong* inference that *each* Defendant acted with scienter.  The scienter standard for forward-looking statements is no longer "reasonable basis" (the pre-Reform Act standard) nor is it even "conscious recklessness" (the Reform Act standard for challenges to statements of present fact).  For forward-looking statements, like the earnings predictions challenged here (and the assumptions underlying those statements), the scienter standard is *actual knowledge*.[20]  15 U.S.C. § 78u-5(c)(1)(B).  That is, Plaintiff must plead that each Defendant *actually knew* that the projections were unattainable when they were made.  *See, e.g., In re Loral Space & Communications Ltd. Sec. Litig.*, No. 01 Civ. 4388(JGK), 2004 WL 376442, at *8 (S.D.N.Y. Feb. 27, 2004) (dismissing action because plaintiffs failed to plead that "defendants knew that the projections were unattainable").[21]

In the Second Circuit, the required strong inference of scienter (here, actual knowledge) can be shown "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Kalnit v. Eichler*, 264 F.3d 131, 138-39 (2d Cir. 2001).  Moreover, Plaintiff is required to make this particularized showing as to *each*

---

[20] Plaintiff's allegations that defendants had "no reasonable basis" for making the earnings projections are thus patently insufficient under the Reform Act's heightened pleading standard. *See, e.g.*, AC ¶¶ 57, 58, 61.

[21] *See also CIENA*, 99 F. Supp. 2d at 662 ( "plaintiffs have not alleged any particularized facts showing that defendants had *actual knowledge* that any of the forward-looking statements [revenue and earnings projections] were false or misleading"); *In re Ascend Commun. Sec. Litig.*, No. CV 97-8861 NW, 1999 U.S. Dist. LEXIS 20716 (C.D. Cal. Feb. 2, 1999) (emphasis added) (plaintiff must establish that at the time projection was made, (1) problems "were severe enough . . . to preclude Ascend's statement from being true," and (2) "that the officer who caused that statement to be made . . . actually knew that Ascend could not follow through on its statement").

*Defendant. In re Citigroup, Inc. Sec. Litig.*, No. 02 Civ. 5779 (LTS)(RLE), 2004 U.S. Dist. LEXIS 15731, at *35-36 (S.D.N.Y. Aug. 10, 2004) ("Plaintiff must allege facts with regard to *each Defendant* that give rise to a strong inference of fraudulent intent," and must allege that an officer or director "'*personally* knew of, or participated in, the fraud.'") (emphasis in original).

As shown below, Plaintiff fails to plead a strong inference of scienter as to each or any Defendant under either of the Second Circuit's tests.  First, Plaintiff cannot demonstrate "motive" because not one of the Defendants sold a single share of EMCOR stock during the class period.  No other motive sufficient to give rise to a strong inference of scienter is proffered. Second, Plaintiff fails to plead particularized circumstantial evidence sufficient to give rise to a strong inference of scienter.  While the Complaint is filled with only  repetitive and conclusory allegations, at its core there is not a single particularized allegation as to *how* or *when* or *which* Defendant *actually knew* that the earnings estimates challenged here were not attainable at the time those estimates were made.

> **A.     Plaintiff Fails To Identify Any Motive Sufficient To Support A Strong Inference – Or Any Inference – Of Scienter As To Any Defendant**
>
> > **1.     Defendants' Failure To Profit From The Alleged Fraud Negates Any Inference Of Scienter**

Plaintiff's theory of scienter and fraud is irremediably undermined by the fact that *not one* of the Defendants are alleged to have sold a single share of EMCOR stock during the purported class period.  Plaintiff's conclusory allegations that three of EMCOR's executives were masterminds of a massive scheme to inflate EMCOR's stock price and defraud the market simply makes no sense in light of the fact that none sought to benefit from the alleged fraud. Rather, here, all three individual Defendants actually watched the value of their substantial holdings in EMCOR stock decline significantly, just as the Company's fortunes did, in July and

in October 2003.[22]  Even before the Reform Act, the Second Circuit recognized that "the fact

that…defendants did not sell their shares during the relevant class period sufficiently undermines

plaintiff's claims regarding motive" so as to doom their claims.  *San Leandro Emergency Med.*

*Group Profit Sharing Plan,* 75 F.3d 801, 814 (2d Cir. 1996) (affirming dismissal where only one

of five defendants sold stock); *see also Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 54 (2d Cir.

1995) ("the fact that [certain] defendants did not sell their shares during the relevant class period

undermines Plaintiffs' claim") (internal citations and quotations omitted); *Leventhal v. Tow*, 48

F. Supp. 2d 104, 114 (D. Conn. 1999) (failure of "primary alleged wrongdoers" to sell stock

negates inference of scienter).  It simply makes no sense that Defendants would purposely

engage in a plan which would ultimately result in their *losing* hundreds of thousands of dollars in

the value of their EMCOR stock.  Allegations like these that run contrary to defendants'

"informed economic self interest" cannot give rise to any inference of scienter.  *See, e.g., Shields*

*v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) (observing that "[i]n looking for a

sufficient allegation of motive, we assume that the defendant is acting in his or her informed

economic self-interest."); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,* 272 F.

Supp. 2d 243, 263 (S.D.N.Y. 2003) (dismissing claims where alleged fraud ran counter to

plaintiffs' interest, holding that "[b]ecause courts assume that defendants act in their 'informed

self-interest,' the allegations in the Complaint affirmatively *refute* scienter") (emphasis added).[23]

---

[22] As of October 3, 2003, Messrs. MacInnis, Chesser and Pompa's total holdings of EMCOR
Stock were approximately 596,000, 129,000, and 47,000, respectively.  *See* Appendix C: Chart
of Defendants' Stock Holdings, Exh. 20.  During the purported class period, Messrs. MacInnis,
Chesser and Pompa's EMCOR holdings lost approximately $9.3 million, $2 million, and
$700,000 in value, respectively.

[23] *See also In re Northern Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 463 (S.D.N.Y. 2000)
("Where '[p]laintiffs' view of the facts defies economic reason…it does not yield [even] a
reasonable inference of fraudulent intent.'") (quoting *Atl. Gypsum Co. v. Lloyd's Int'l Corp.*, 753
F. Supp. 505, 514 (S.D.N.Y. 1990)).

2.       **Plaintiff Offers No Other Motive Sufficient To Infer Scienter**

Plaintiff attempts to conjure a motive by alleging that the Defendants were seeking to sell the company, and that they "knew that meeting earnings was imperative to finding a willing suitor." AC ¶ 12. This phantom allegation fails for several reasons. First, there are absolutely no facts, pleaded or actual, that support the suggestion that EMCOR was attempting to sell itself. Management's earlier belief that the stock was undervalued and EMCOR's hiring of an advertising firm are hardly the kind of particularized facts that would support any inference that the Company was being groomed for a sale.[24]

Second, courts have routinely rejected "abstract" motives where no "personal concrete benefits" are obtained. *See, e.g., Salinger v. Projectavision, Inc.*, 934 F. Supp. 1402, 1414 (S.D.N.Y. 1996) ("It is not sufficient…to plead scienter by alleging an abstract desire to enable the company to continue to enjoy a high stock price and thereby ease the difficulties of raising of additional capital."). The logic behind these decisions is simple: "maintain[ing] the appearance of corporate profitability, or of the success of an investment" provides benefits to every corporation, whether generally or in the context of an acquisition, a merger, a credit negotiation or otherwise. *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996). Indeed, these

---

[24] Plaintiff's only support for this fanciful motive is that *two years prior* to the purported class period, Mr. MacInnis opined that the company's stock price was undervalued, and that EMCOR retained an advertising firm in May of 2003. AC ¶¶ 30, 31**.** However, courts have recognized that statements expressing disappointment in stock price are common place in corporate America. "Any investor tuning into a cable business program on any given day would hear the same or similar comments being made by some corporate executive touting the strength of his company and the bargain price for which its shares currently sell." *In re Staffmark, Inc. Sec. Litig.*, 123 F. Supp. 2d 1160, 1173 (E.D. Ark. 2000).

Moreover, if EMCOR were looking to "sell itself," why would it hire a marketing firm, but not an investment bank to seek an acquirer? The more reasonable explanation for hiring the marketing firm is EMCOR's recent acquisition of CES, a facilities services business, which as Mr. MacInnis explained requires "enhanced marketing and sales activities" compared to construction. Tr. of 4/24/03, Exh. 5, at 5. *See, e.g., Duane Reade*, 2003 WL 22801416, at *9 n.22 ("Where a plaintiff's theory of motive is 'belied by logic,' it must be rejected.").

allegations of a hoped-for acquisition are even more attenuated than those rejected by Judge

Squatrito.  *Leventhal,* 48 F. Supp. 2d at 115 (rejecting motive to artificially inflate stock price to

obtain more favorable terms for the company in stock-for-stock transactions).[25]

In sum, Plaintiff's allegations of "motive" are conclusory and illogical.  They do not

come close to giving rise to the strong inference of scienter the Reform Act requires.

### B.    Plaintiff Fails To Allege Specific Facts That Constitute Strong Circumstantial Evidence That Defendants Had Actual Knowledge That Their Earnings Predictions Could Not Be Achieved

In the absence of motive, as here, "the strength of the circumstantial allegations must be

correspondingly greater."  *Kalnit*, 264 F.3d at 142.  This is because a plaintiff who claims that

defendants acted against their economic self interest must make a stronger case.[26]  Here, all of

the Defendants' actions were inconsistent with an intent to deceive; not only because they did

not profit by their supposed fraud but also because they voluntarily revised their earnings

guidance in July and then again in October – weeks in advance of their regular earnings

announcement.  All of these facts undermine Plaintiff's theory of fraud.  *See Rombach*, 355 F.3d

at 176 ("[T]he allegation that defendants behaved recklessly is weakened by their disclosure of

certain financial problems prior to the deadline to file its financial statements.").

Rather than compelling facts giving rise to a strong inference, Plaintiff here offers only

(1) fraud-by-hindsight allegations based on the fact that EMCOR's forecasts were not achieved

and (2) Mr. MacInnis' supposed admission that this was due to a failure of the private sector to

recover when he had previously said that the forecast assumed that it would not.  As shown

---

[25] *See also GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237 (3d Cir. 2004) ("[O]fficers will usually reap financial benefits from a successful transaction. Such allegations alone cannot give rise to a 'strong inference' of fraudulent intent.").

[26] *See, e.g., DiLeo v. Ernst & Young,* 901 F.2d 624, 629 (7th Cir. 1990) ("One who believes that another has behaved irrationally has to make a strong case.").

below, this "circumstantial evidence" falls far short of raising *any* inference, let alone a *strong inference* of *actual knowledge* that the Reform Act requires.

> ### 1. The Mere Fact that EMCOR's Forecasts Did Not Come To Fruition Is Insufficient to Give Rise to Any Inference of Scienter

Plaintiff alleges that Mr. MacInnis' October statement explaining the reasons for the Company's revised earnings guidance evidences that the prior guidance reflected fraud.  AC ¶¶ 76, 77.  This approach fails.

Even before the Reform Act, it was insufficient to take predictions of a prosperous future and simply hold[] them up against the backdrop of what actually transpired."  *Shields,* 25 F.3d at 1129.  While this "is sufficient to allege that the defendants were wrong…misguided optimism is not a cause of action, and does not support an inference of fraud."  *Id.*  This Court, too, has recognized this principle:  "[t]he fact that the defendants were mistakenly optimistic…does not make their statements…fraudulent."  *Freedman v. Value Health, Inc.*, Nos. 3:95CV2038 JCH, 3:97CV2711, 2000 WL 630916, at *5, *3 (D. Conn. Mar. 24, 2000) (emphasis added).  Even where it turns out that the challenged forecasts were based on incorrect or even unreasonable assumptions, that does not equal fraud.  *Id.* at *3, *5 ("While it may be the case that factors existed that 'jeopardized' the likelihood that the [prediction would materialize]" and "[w]hile the more prudent course of business may have been to act with more caution…, the court cannot say the defendants' [conduct] rise[s] to the level of fraud.").[27]

---

[27] *See also Northern Telecom*, 116 F. Supp. 2d at 467 ("forward-looking statements need not be accurate in hindsight to avoid liability under the securities laws," despite evidence that plaintiffs' claim should have put defendants on notice that optimistic predictions were foolhardy); *CIENA*, 99 F. Supp. 2d at 662 (management's projection based on acquisition of contract not made fraudulent by hindsight allegation that "[the contractor] made an SEC filing which perhaps should have alerted CIENA (as well as the market) to the fact that DTI was switching suppliers" because existence of the filing "d[id] not mean that DTI directly advised CIENA of that fact").

Instead, plaintiffs must plead particularized facts demonstrating that defendants *actually knew* that their earnings estimates could not be achieved when those forecasts were made.  *See, e.g., Ressler v. Liz Claiborne, Inc.,* 75 F. Supp. 2d 43 (E.D.N.Y. 1999) (allegations failed because plaintiff has not pled facts showing that defendants knew forward-looking statements were false when made).[28]  Plaintiff's fraud-by-hindsight allegations are insufficient to show that any Defendant actually knew any fact that rendered EMCOR's forecasts unattainable at the time such forecasts were made.

> ### 2. Mr. MacInnis' Post-Mortem Statements Concerning Backlog Mix And Late And Less Profitable HVAC Work In No Way Demonstrate Actual Knowledge That EMCOR's Forecasts Would Not Be Achieved

Next Plaintiff attempts to meet his burden of demonstrating that Defendants knew that the earnings projection could not be achieved by pointing to certain after-the-fact assessments of what went wrong and characterizing them as "admissions" that Defendants knew of these facts and their certain impact all along.  As a threshold matter, it is well settled that after-the-fact statements identifying the causes of the missed prediction, or even admitting to mistakes in assessing circumstances at the time the forecasts were made, are not evidence of securities fraud. *See In re Crystal Brands Sec. Litig.*, 862 F. Supp. 745, 750 (D. Conn. 1994) (a disclosure explaining the origins of the company's financial difficulties is not an admission that defendants were aware of the problems earlier, but only shows "that defendants…admitted to being human). As one court put it, "the securities laws do not put executives of public corporations to the choice of either hiding their mistakes or facing a class-action shareholder suit." *Herschfang v. Citicorp*, 767 F. Supp. 1251, 1258 (S.D.N.Y. 1991).

---

[28] *See also In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 536 (3d Cir. 1999) (fact that defendant corporation did not go forward with projected plan "to reprice its rates" did not give rise to a strong inference of actual knowledge, as defendant "may have intended to reprice the accounts…at the time of the [first] statement and subsequently changed its business strategy").

Moreover, the so-called "admissions" Plaintiff points to are nothing of the sort.  Instead, they are out-and-out distortions of what Mr. McInnis actually said.[29]  As shown, and as is undisputed, Mr. MacInnis consistently stated before and during the class period that in making its forecasts EMCOR did not assume any increase in the high-margin, private sector work that had been so lucrative in the past.  In October 2003, Mr. MacInnis explained that part of the reason these projections were missed was that the "current portfolio of longer-term projects…[was] over weighted towards public sector work" (AC ¶ 76(a),(f),(g)) and that this public sector work was less profitable (*id.* ¶ 76(a), 78).  *See supra* at 5-6, 20-21.  Plaintiff alleges that when Mr. MacInnis' said that the public sector work in the backlog turned out to be "overweighted," he was somehow "admitting" (1) that it had been overweighted and in the same proportion, all along, and (2) that Defendants failed to take this into account when their projections were made.  Plaintiff also alleges that Mr. MacInnis stated that EMCOR's small-task, fast-turn, high-margin projects – primarily HVAC service projects – failed to materialize at expected levels and that this was also due to the slowdown in private sector work.  Plaintiff contends that these comments about less-than-expected profits from the public sector and quick-turn work constitute an admission that the projections could not be achieved if the private sector work did not improve.  AC ¶ 76, 77.  In this same vein, Plaintiff also contends that Mr. MacInnis' October statement that the prolonged absence of EMCOR's highest gross margin work had a negative impact on profits (AC ¶ 76) is evidence of scienter.

---

[29] As Judge Squatrito explained: "Consideration of the full text of the memoranda…reveals a different picture than the one framed in the complaint and undermines the credibility of the claims raised in the complaint."  *Leventhal,* 48 F. Supp. 2d at 113.  As one Circuit Court explained, in words equally applicable here:  "The complaint rests on mischaracterizations of the public record, exaggeration of a single statement, and isolation of that statement from its context and from the wealth of other information publicly available when it was made.  Hyperbole and speculation cannot give rise to a claim of securities fraud."  *Phillips v. LCI Int'l, Inc.,* 190 F.3d 609, 615 (4th Cir. 1999).

All of this is sophistry which is easily disposed of.  First, as Mr. MacInnis emphasized throughout the year, EMCOR's 2003 forecasts were predicated on *maintaining the status quo* in the balance of public and private sector work.  As early as December 2002, the Company disclosed that its "contract backlog, despite being very high, is composed of a disproportionate quantity of relatively slow moving new construction projects in the public sector" and that this public sector work "is net-net less profitable than comparable private sector work."  Tr. 12/20/02, Exh. 3, at 11, AC ¶ 34.  Similar disclosures were provided throughout the class period. *See, e.g.*, Tr. 7/24/03,  Exh. 6, at 6, 8, 12 (AC ¶ 71); *see also,* AC ¶ 62 (quoting May 20, 2003 CNN Interview ("we're still reliant, primarily, on the public and quasi-public sector for our growth this year")). [30]  EMCOR also noted that approximately 20% of revenues came from fast turn, unscheduled, high margin work that was not included in the backlog, primarily seasonal HVAC repair and replacement projects in the second half of the year and noted also that this work has "very high gross margins," and the lack of this work had a "disproportionately large impact on margins."  Tr. 7/24/03, Exh. 6, at 2.[31]

_____

[30] Plaintiff also claims that no credible explanation was given for why the change in backlog to public work wasn't more predictable, and that this somehow evidences Defendants' intent to defraud.  AC ¶ 80.  However, Mr. MacInnis explained that, for example, in the electrical segment of the backlog, "[w]e have seen increasing degrees of intransigence on public sector projects from customers who are either budget-constrained or otherwise indisposed to provide the kind of flexibility and opportunity for earning of premiums *that we had previously experienced in the public sector*."  Tr. 10/3/03, Exh. 12, at 17 (emphasis added).  Thus, as Mr. MacInnis made clear, EMCOR's margin opportunities were impeded by deteriorating situations that did not follow historical patterns or expectations.  *See, e.g.*, *id.* at 17 (Question: "[A]re the public sector contracts…deteriorating relative to when you initially won the contracts?"  Answer: "Yes.").  That plaintiff and his lawyers characterizes this explanation as "incredible" is hardly the making of a claim of fraud.

[31] Plaintiff suggests that Messrs. MacInnis and Chesser failed to disclose the extent of EMCOR's reliance upon quick turn projects to meet the revenue goals and did not disclose that quick turn work had slowed during the first quarter of 2003.  *See* AC ¶ 59.  Plaintiff rests this assertion upon one statement by Mr. Chesser, given on-the-fly in response to an analyst's question during a conference call, that historical reliance on quick turn projects was twenty percent, rather than

Mr. MacInnis *never said* that the fact that EMCOR's backlog mix was overweighted towards the less profitable public sector was not factored into the April and July earnings forecasts.  Just the opposite.  It is just that he did not expect that the backlog would become ever more overweighted or that the margins in the public sector would decline further still.  Mr. MacInnis also *never said*, before or after the fact, that the high-margin small project service work was dependent on a general improvement in the private sector construction services market.  *See* AC ¶ 76(b,d,e), 77.  What it was dependent on was the weather.  Thus, in July, Mr. MacInnis explicitly differentiated the general private sector market from the small project work and blamed the disappointment on the lack of small project work:  "What was missing from the mix was typically very high margin…work of a type that is associated with the spring turning on and servicing and upgrading of hvac units.  And it was purely and simply a weather-related problem."  Tr. 7/24/03, Exh. 6, at 8.  What happened between July and October, was that even as the hot weather and the fast turn projects finally came, they failed to return "in a way that was going to significantly supplement [the company's] margins."  AC ¶ 77.  In other words, as MacInnis explained in October, although revenues increased, "this work is *not being performed at gross margin levels* that will significantly improve our overall margins."  Tr. 10/3/03, Exh. 12, at 3 (emphasis added).[32]

---

twenty-five percent.  *Id.*  The issue is not whether Mr. Chesser nailed the exact percentage, but whether EMCOR disclosed a reliance on these types of projects to meet revenue projections and profitability goals – which it did.  *See* Tr. 4/24/03, Exh. 5, at 8 ("small task, short term projects that make up a *substantial part of [our]* business…*and a substantial part of our profitability,* are still not as strong as we would like") (emphasis added).

[32] While Mr. MacInnis did note that both revenues and profitability of the small task projects were not what EMCOR had anticipated, he emphasized that the issue was "primarily, the margins."  Tr. 10/3/03, Exh. 12, at 6.  That margins (*i.e.,* profit) was the issue with the HVAC work (not revenue as plaintiff intimates) is further born out by the fact that EMCOR *never* revised its revenue guidance during the purported class period.  In other words, the work the company thought would come in, did – it just failed to yield the margins EMCOR expected.

Finally, Mr. MacInnis' lament that it was hard to perform well when deprived of high-margin private sector work for a prolonged period reflects nothing more than the very obvious observation that an uptick in the private sector would have helped, and that the lack of it limited EMCOR's ability to compensate for the unexpectedly bad breaks it suffered in the other sectors. It is equally obvious from EMCOR's statements throughout the class period that an uptick in private sector was not expected and, thus, that EMCOR would have to do the best with what it got.[33]  Due to all the circumstances discussed herein, what EMCOR "got from the market" wasn't nearly as good as even its diminished expectations had predicted.  That, however, is not securities fraud.  *See Aegon,* 2004 WL 1415973, at *18 ("'overly optimistic projections…are…insufficient for section 10(b) liability'") (citation omitted); *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1278 (D.C. Cir. 1994) ("The fact that the company's performance did not conform to that predicted supports no inference that [its] statements lacked a reasonable basis when made.  Every prediction of success that fails to materialize cannot create on that account an action for securities fraud….'") (citation omitted).

Plaintiff provides *no facts*, circumstantial or otherwise, giving rise to a *strong* inference that each or any Defendant *actually knew* at the time the earnings forecasts were made in April and July that they could not be achieved.  As the Second Circuit observed, in words applicable here, at most, "[t]his technique [of comparing eventual results to earlier predictions] is sufficient to allege that the defendants were wrong; but misguided optimism is not a cause of action, and does not support an inference of fraud."  *Shields*, 25 F.3d at 1129; *see also Value Health*, 2000 WL 630916, at *5.  This Complaint must therefore be dismissed for failure to plead scienter.

---

[33] *See* Tr. 7/24/03, Exh. 6, at 12 ("[W]hen I say that I think that things will improve in the second half, I'm not saying that the markets will give us anything better than what they have been giving us so far.  I'm saying that we will do better with what we have got, because we always do.")

**IV.     PLAINTIFF FAILS TO PLEAD PARTICULARIZED FACTS THAT THE EARNINGS PREDICTIONS WERE FALSE WHEN MADE**

In addition to requiring that plaintiffs plead facts supporting a strong inference of scienter, the Reform Act requires, that these facts be pleaded *with particularity*. 15 U.S.C. § 78u-4(b)(2). Plaintiff must also allege *with particularity* that *each* challenged statement or omission was false *when made*. 15 U.S.C. § 78u-4(b)(1*)* (plaintiff must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading"); *see, e.g., Vogel v. Sands Bros. & Co. Ltd.*, 126 F. Supp. 2d 730, 736 (S.D.N.Y. 2001) ("[E]ach allegation of misrepresentation or omission must be made with particularity.").[34]  Moreover, under the Reform Act, "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

Here, Plaintiff fails to plead particularized facts, or in most instances *any* facts, to show that any Defendant *knew* that the earnings predictions were false, or that they were even false in the first instance. Plaintiff does not even attempt to plead that any particular Defendant knew any particular information. And, most of the challenged predictions are alleged to be false based on nothing more than Plaintiff's say-so or the say-so of unidentified sources, and the challenges to the single "factual" statement claimed to be false (concerning the smooth progress of the CES integration) are so vague they are virtually meaningless. As shown below, lacking are the

_____

[34] *See also In re Citigroup, Inc. Sec. Litig.*, No. 02 CIV .5779(LTS)(RLE), 2004 WL 1794465, at *10 (S.D.N.Y. Aug. 10, 2004) (plaintiffs' "generalized allegations" held "insufficient to satisfy the requirements that allegedly fraudulent statements and omissions, and the reasons why they are alleged to be fraudulent, be identified with particularity"); *Pfeiffer v. Goldman Sachs & Co.*, No. 02 Civ .6912 HB, 2003 WL 21505876, at *4 (S.D.N.Y. June 30, 2003) ("A plaintiff alleging securities fraud must allege particular facts for each of the elements of the claim . . .").

corroborative particulars or attribution to support the otherwise conclusory allegation that the earnings predictions or any statements were a product of fraud.

### A.    Plaintiff's Group Pleading Allegations Fail

"When fraud is alleged against multiple defendants, a plaintiff must plead with *particularity* by setting forth separately the acts complained of *by each Defendant*."  *Double Alpha, Inc. v. Mako Partners, L.P.*, No. 99 Civ. 11541 DC, 2000 WL 1036034, at *3 (S.D.N.Y. July 27, 2000) (emphasis added).[35]  Court routinely dismiss claims against multiple defendants which merely "attributed [scienter] to the Defendants as a group without citing to specific…actions or inactions of particular defendants."  *Cross Media.*, 314 F. Supp. 2d at 263.[36]  Here, Plaintiff's conclusory allegations do not differentiate among the Defendants, or even come close to identifying *how* or *when* any Defendant learned of information which supposedly

_____

[35] *See also In re Keyspan Corp. Sec. Litig.*, No. 01 CV 5852(ARR), 2003 WL 1702279, at *24 (E.D.N.Y. Mar. 21, 2003) ("Plaintiffs fail to specify how and when the defendants became aware of information about [the recently acquired subsidiary] contradicting their public statements….Without specific allegations pointing to defendants' awareness or recklessness, plaintiffs have not alleged fraud with the particularity required."); *Aegon*, 2004 WL 1415973, at *18 (plaintiff failed to plead "*particular facts* demonstrating that the defendants had actually received non-public information which contradicted their public statements") (emphasis added); *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 562 (S.D.N.Y. 2004) (same); *Ferber v. Travelers Corp.*, 785 F. Supp. 1101, 1109-10 (D. Conn. 1991) (same).

[36] Mr. Chesser is alleged only to have made a single statement (which is not adequately alleged to be false) (AC ¶ 59) and *no* statement is attributed to Mr. Pompa.  Plaintiff's reliance on the group pleading doctrine fails.  *Id.* ¶¶ 25-26.  This type of generalized  pleading was abolished by the Reform Act's heightened pleading requirements.  *See Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 364 (5th Cir. 2004) (the group pleading doctrine "cannot withstand the…[Reform Act's] specific requirement that the untrue statements or omissions be set forth with particularity as to 'the defendant' and that scienter be pleaded with regard to 'each act or omission'" and as to each defendant).  Even if the doctrine had survived, Plaintiff fails to plead each defendant's participation in making the challenged earnings forecasts.  *See Double Alpha, Inc.*, 2000 WL 1036034, at *3.  Moreover, the group pleading doctrine never applied to oral statements made by individuals, like the majority of the projections challenged here.  *See, e.g., Elliott Assocs., L.P. v. Covance, Inc.*, No. 00 Civ. 4115 (SAS), 2000 U.S. Dist. LEXIS 17099, at *38 (S.D.N.Y. Nov. 28, 2000).

demonstrates that the earnings forecasts could not be achieved.  Plaintiff's one-size-fits all

allegations must be dismissed.

> **B.   Plaintiff's Conclusory Allegations Are Insufficient To Demonstrate That The Earnings Predictions Were Fraudulent**

Plaintiff's claims also fail for the simple reason that there are *no* facts (let alone

*particularized* facts) to support the conclusion that the Defendants somehow knew in April and

July that margins would deteriorate (due to late HVAC work, market pressures, a decline in

private sector work and higher integration costs that) causing EMCOR not to meet its earnings

projection.  Plaintiff fails to plead *what* data was available when the projections were made that

showed they couldn't be achieved or *which* of these Defendants knew this information or *when*

and *how* did they learn it?  If from documents, *who* authored and received the document and

*when*?  *What* did the document say?  Likewise, other than vague references to former employees

who characterized the CES integration as "chaotic," AC ¶ 84(c), these questions are left

unanswered.  Missing are any particularized allegations as to *what* had gone poorly in the

integration process.  If projects failed to materialize, *how* significant were they in terms of

revenue, profit and timing and *when* did they fall through?  *Who* knew about it?  None of this

basic detail, which the Reform Act requires.  *See Rombach*, 355 F.3d at 172-74 ("To succeed on

this claim, plaintiffs must do more than say that the statements in the press releases were false

and misleading; they must demonstrate *with specificity* why and how that is so.") (emphasis

added); *Alteram S.A. v. Beacon Hill Asset Mgmt. LLC*, No. 03 Civ. 2387 (LAK), 2004 U.S. Dist.

LEXIS 2927, at *4 (S.D.N.Y. Feb. 27, 2004) (dismissing complaint, reasoning that "[e]ven

where the complaint identifies the date, speaker and other particulars of an alleged misleading

statement, it often fails adequately to plead facts explaining why the statement is misleading.").[37]

As shown, merely pointing to a forecast in contrast to actual results or juxtapositiong a statement that the CES integration had "gone very well" (*id. ¶* 72) with the conclusory allegations that it had in fact "gone poorly" (*id.* ¶¶ 72, 81), is obviously insufficient.  The Second Circuit recently affirmed the dismissal of similar allegations.  In *Rombach*, the Court held that fraud could not be inferred from the fact that the defendant initially stated that integration of golf courses was "progressing smoothly," and then in later statements acknowledged it was "disappointed" with performance of certain newly acquired sites.  355 F.3d at 172-74.  In sum, because "circular, speculatory and conclusory allegations are inadequate to satisfy the PSLRA's and Rule 9(b)'s requirement of particularized pleading," *Vogel*, 126 F. Supp. 2d at 738, all that is pled here, the Complaint must be dismissed.

### C.    Conclusory Allegations Of EMCOR's Internal Reporting System Are Insufficient

Plaintiff alleges that EMCOR's internal controls were so good that the Defendants "knew" that the earlier earnings guidance was unachievable.  AC ¶ 58(a), 79.  However, simply noting, as Plaintiff does here, that a company has some system of internal reporting has never been sufficient to plead scienter.  *See, e.g., San Leandro*, 75 F.3d at 812-13 ("Plaintiffs' unsupported general claim of the existence of confidential company sales reports that revealed the larger decline in sales is insufficient to survive a motion to dismiss."); *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 988 (9th Cir. 1999) ("Every sophisticated corporation uses some

---

[37] *See also In re Nokia Corp. Sec. Litig.*, No. 96 CIV. 3752(DC), 1998 WL 150963 (S.D.N.Y. Apr. 1, 1998) (complaint failed to allege "who prepared the projected figures, when they were prepared, how firm the numbers were, or which [company] officers reviewed them'").

kind of internal reporting.").[38]  Lacking even basic *details* about what information that reporting system provided and to whom and when, this allegation is not even probative of scienter.

> ### D.     Plaintiff Fails To Sufficiently Describe His Sources Or Provide Particularized Facts

Plaintiff also bases certain allegations in the Complaint on the say-so of anonymous sources.  AC ¶ 84.  To satisfy the Reform Act's pleading requirements, plaintiffs must either (1) name their personal sources; (2) describe their personal sources with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged; or (3) where personal sources are not identified or sufficiently described, provide "other facts" sufficient to support their allegations.  *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000).  Plaintiff does not satisfy any of these alternatives.

First, Plaintiff does not identify any of his sources, nor does he attempt to establish that these unidentified "former employees" were in positions that would give them access to the information alleged or otherwise provide credibility for their opinions.  Some are described as engineers at one of EMCOR's 140 subsidiaries, but there is no indication how or why these engineers would have access to top-level consolidated financial information necessary to assess earnings estimates for the entire company (AC ¶ 84(a-b)).  Still others are described only as former employees (with no indication of his/her title (*id.* ¶ 84(c-d)) leaving one to wonder if the

---

[38] *See also Aegon*, 2004 WL 1415973, at *17 ("plaintiffs have not set forth any evidence of reports or data to establish that the Defendants knew that their reserves [for future losses] were inadequate or that their economic assumptions were improper"); *Duane Reade*, 2003 WL 22801416, at *10 (management's access to interim sales data indicating that sales were down insufficient to support claim that they knew "that their predictions for the entire quarter would prove false"); *Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357, 365 (1st Cir. 1994) (requiring plaintiffs to "specifically identify the internal reports and the public statements underlying their claims, providing names and dates").

employee was a top-level manager (who *might* be privy to relevant information) or an administrative employee (who probably would not).

Courts routinely reject as insufficient allegations that are even more particular than the barebones allegations here. *See, e.g., In re Flag Telecom*, 308 F. Supp. 2d 249, 261-62 (S.D.N.Y. 2004) (dismissing claims where "it is not apparent from the informant's title that he or she would probably possess such information."); *In re MSC Indus. Direct Co., Inc. Sec. Litig.*, 283 F. Supp. 2d 838, 847 (E.D.N.Y. 2003) (description such as "a former director of an MSC corporate department," and "a former MSC employee whose responsibilities were associated with the Company's acquisitions," were insufficient). Because the few descriptions offered here are even less detailed, these statements may not be credited.[39]

In any event, the "information" provided by these "sources" is so general it is essentially meaningless. Plaintiff alleges in the most vague terms topics of information known by these individuals, *e.g.*, the CES integration had "gone poorly"; that there were "major contract problems in the facilities management business" and that "senior managers in Connecticut" were aware of these problems, although no specifics are provided. What went wrong with the CES integration? Who knew about it and when? What were the "major contract problems and when did they arise? Did any have a profitability impact in 2003? Who were the "senior managers" who knew about it (Defendants?) and when and how did they find out? The Reform Act makes

---

[39] *See also Feasby v. Industri-Matematik Int'l Corp.*, No. 99 Civ. 8761 LTS JCF, 2003 WL 22976327, at *4 (S.D.N.Y. Dec. 19, 2003) (rejecting source allegations where complaint failed to "describe the positions held by or work assignments of the former employees" "or any other information that would support an inference that the sources would possess the information attributed to them").

clear that these types of conclusory, bare-bones allegations are insufficient.[40]  Accordingly,

Plaintiff's claims should be dismissed.

## V.  DEFENDANTS' STATEMENTS OF PUFFERY AND HISTORICAL FACT ARE NOT ACTIONABLE AS A MATTER OF LAW.

The Complaint identifies several statements of corporate optimism and historical fact.

While unclear whether Plaintiff is actually challenging these statements, it is clear that such

statements are not actionable as a matter of law.  For example, statements extolling "the

nimbleness of EMCOR companies in moving to sectors with demand," (AC ¶ 40), and

proclaiming that "[w]e're extremely happy about the backlog evolution," (*id.* ¶ 57) are vague

statements of optimism constitute the kind of "corporate cheerleading" that courts have found to

be immaterial as a matter of law.  *See* Appendix D:  Statements of Non-Actionable Puffery, Exh.

21.  *See San Leandro*, 75 F.3d at 811 (dismissing as puffery statements that "the company

'should deliver income growth consistent with its historically superior performance' and 'we are

optimistic about 1993'); *Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 57 (2d Cir. 1996)

(statement that "business strategies [would] lead to continued prosperity" dismissed as puffery);

*Nokia*, 1999 WL 150963, at *7 (dismissing as puffing statements that "confidence in market

growth potential has further strengthened" and "Nokia's market position in its main business has

continued to improve").  As the Second Circuit explained, "companies must be permitted to

operate with a hopeful outlook: 'People in charge of an enterprise are not required to take a

gloomy, fearful or defeatist view of the future…."  *Rombach*, 355 F.3d at 174.

Likewise, Plaintiff identifies several statements of historical fact that are not alleged to be

false.  *See* Appendix E:  Statements of Historical Fact Not Challenged as False or Misleading,

---

[40] *See, e.g., Flag*, 308 F. Supp. 2d at 267 (allegation that former executive revealed that defendants participated in conference calls where outlook was described as "terrible" was "far too vague).

Exh. 22.  Not surprisingly, statements of historical fact that are not alleged to be false cannot be

the basis of a claim for securities fraud.[41]   *Duane Reade*, 2003 WL 22801416, at *6

("'Defendants may not be held liable under the securities laws for accurate reports of past

successes, even if present circumstances are less rosy.'") (citation omitted).[42]

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully urge the Court to dismiss Plaintiff's

complaint.

Dated: August 31, 2004                                    Respectfully submitted,

                                                          LATHAM & WATKINS LLP

                                              By:  _____/s/_____
                                                          Michele E. Rose, *pro hac vice*
                                                               Fed. Bar. No. ct25917
                                                          Laurie B. Smilan, *pro hac vice*
                                                               Fed. Bar. No. ct25966
                                                          LATHAM & WATKINS LLP
                                                          11955 Freedom Drive
                                                          Reston, Virginia  20190
                                                          (703) 456-1000 (phone)
                                                          (703) 456-1001 (fax)
                                                          E-mail:  michele.rose@lw.com

                                                          *Attorneys for Defendants*

---

[41] The Amended Complaint lists pages of allegations outside the purported Class Period, all of which should be dismissed or alternatively stricken pursuant to Rule 12(f) of the Federal Rules of Civil Procedure.  *See* AC ¶¶ 9, 23, 29-30, 34-35, 37-38, 40-41, 44-49 (*See* Appendix F at Exh. 23).  Statements made before or after the defined class period are not actionable.  *In re IBM Corporate Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998).  This is because, "'[a]s the class period defines the time during which defendants' fraud was allegedly alive in the market, statements made…before or after the purported class period are irrelevant to plaintiffs' fraud claims.'"  *In re Sun Healthcare Group, Inc. Sec. Litig.*, 181 F. Supp. 2d 1283, 1293 (D.N.M. 2002).

[42] Because plaintiff fails to state a claim for primary violation of the securities laws, his section 20(a) claim for secondary control person liability also fails.  *See Shields*, 25 F.3d at 1132; *Feasby*, 2003 WL 22976327, at *6 ("Plaintiffs have failed to adequately plead a primary violation under Section 10(b); accordingly, their Section 20(a) claims for 'controlling person' must be dismissed.").

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the following documents have been sent Federal Express Overnight Mail, postage pre-paid, addresses to the counsel listed below:

1.    Defendants' Notice of Motion to Dismiss the Consolidated Amended Class Action Complaint;

2.    Memorandum of Law in Support of Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint;

3.    Affidavit of Heather M. McPhee in Support of the Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint, and accompanying exhibits; and

4.    A proposed form Order Granting Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint.

Darren J. Check
Schiffrin & Barroway
Three Bala Plaza East
Suite 400
Bala Cynwyd, PA 19004

I FURTHER CERTIFY that the above was filed electronically with the court, pursuant to Local Civil Rule ?, and that a courtesy copy was provided to the Honorable Janet C. Hall, U.S.D.J..

Dated: August 31, 2004                                   _____

David A. Becker