UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

2005 JUL 22  P 4: 47

U.S. DISTRICT COURT

IN RE EMCOR GROUP, INC.
SECURITIES LITIGATION

: CIVIL ACTION NO.
: 3:04-cv-531 (JCH)
:
: JULY 22, 2005

## RULING ON DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
[DKT. NO. 36]

Lead Plaintiff Mark Coffey brings this action on behalf of himself and others similarly situated ("Class" or "Plaintiffs") pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5. Plaintiffs allege that Defendants EMCOR Group, Inc. ("Emcor" or the "Company"), Frank T. MacInnis, Leicle E. Chesser, and Mark A. Pompa (together with MacInnis and Chesser the "Individual Defendants") made false or misleading statements in public filings, press releases, interviews, and analyst conference calls between April 9, 2003 and October 2, 2003 (the "Class Period"). The defendants deny these allegations and bring this motion to dismiss the Plaintiffs' Consolidated Amended Class Action Complaint (the "Amended Complaint") pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4 et seq. For the reasons that follow, defendants' motion to dismiss is hereby granted.

## I.     BACKGROUND[1]

Emcor is a publicly traded Delaware corporation with its principal place of business in Norwalk, Connecticut. Am. Compl. at ¶ 19. Emcor, through over 70 subsidiaries, operates as one of the world's leading specialty construction and facilities services firms. See id. It installs and maintains electrical, mechanical, plumbing, communications, and various other systems for both domestic and international organizations. See id. Emcor has traditionally focused on two areas: electrical and mechanical construction and facilities management, which make up 80% and 20% of Emcor's annual revenue, respectively. See id. at ¶ 32. Within the construction area, Emcor's work is further divided between large capital improvement projects versus small projects worth under $250,000, and between public sector and private sector projects. See id. at ¶ 33.

Private sector projects are usually more profitable than public sector projects, primarily due to the opportunity to earn performance bonuses on private projects. See id. at ¶ 34. Also, the differences in the contract formation processes between private and public sector work, contract negotiation versus competitive bidding, also tend to make private sector jobs more profitable. See id. at ¶ 35. The premiums that generally are negotiated into a private contract, but are not available in the competitive bidding scheme, provide larger margins for Emcor. See id.

When discussing its workload, Emcor generally makes references to its "contract

---

[1] The court takes the facts alleged in the Plaintiffs' Consolidated Amended Complaint as true, as it must, and draws all inferences in the Plaintiffs' favor. See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds by Davis v. Scherer, 468 U.S. 183 (1984).

backlog." The contract backlog represents Emcor's reserve of uncompleted work. See id. at ¶ 36. This backlog, portions of which can be recognized as revenue once a certain amount of a given project is complete, is used by Emcor as a measure of expected revenue. See id.

MacInnis has been the Chairman of the Board of Directors and CEO of Emcor since 1994. See id. at ¶ 20. He also assumed the duties of President and Chief Operating Officer of Emcor following the departure of Jeffrey M. Levy on February 26, 2004. See id. Chesser has been an Executive Vice President and the Chief Financial Officer at Emcor since 1994. See id. at ¶ 21. From 1994 to June 2003, Pompa served as a Vice President and as Controller of Emcor. See id. at ¶ 22. He was promoted to Senior Vice President and assumed the duties of the Chief Accounting Officer and Treasurer of Emcor in 2003. See id.

According to the Plaintiffs, the Individual Defendants, and a few other executives, comprise a small, cohesive group of senior management that closely monitors Emcor's operations. See id. at ¶ 23. In fact, the Individual Defendants had held senior executive positions at Emcor for nearly a decade before the Class Period. See id. During the Class Period the Individual Defendants, in light of their senior positions, had access to inside information regarding Emcor's business operations, financial condition, and present and future business prospects. See id. at ¶ 24. Additionally, because of their positions at Emcor, the Individual Defendants had the authority to control the contents of Emcor's SEC filings, reports, press releases, and presentations to securities analysts. See id. at ¶ 28. This allowed the Individual Defendants to control the flow of information to the investing public. See id. Their

positions also allowed them the opportunity to stop the release of misleading information or subsequently to correct any misleading statements attributable to Emcor. See id.

Throughout the Class Period, one or more of the Individual Defendants made public statements concerning Emcor's earnings guidance. For example, during an April 24, 2003 conference call, CEO MacInnis reaffirmed Emcor's earnings guidance, and reiterated the claim that the guidance was based on the assumption that private sector construction spending would not improve over 2002 levels. Specifically, MacInnis stated:

> Two months ago, I provided 2003 revenue and earnings guidance to the market at levels of $4.4 to $4.6 billion of revenue and $4.25 to $4.60 earnings per share. Based on our current outlook, I'm pleased to reiterate that guidance today.
>
> \* \* \*
>
> [M]y underlying assumption with respect to the lower end or base case per our guidance – that is, $4.4 billion of revenue and $4.25 per share – do not assume any improvement in the private sector for the remainder of this year.

See id. at ¶ 4.

Additionally, Emcor commented on its backlog. MacInnis stated:

EMCOR's contract backlog, consistently and conservatively calculated, has risen from about $1 billion at the end of 1997 to more than $3 billion today. This growth has been accomplished, despite a major recession and its impact on the former flywheel of our business, the private sector commercial market. Through replacements and enhancements of overall contract backlog, despite a major decline in commercial building construction, is a statement of our versatility and of our success in accessing strong markets like government and institutional work, healthcare, water and wastewater treatment and public transportation.

\* \* \*

> This is the kind of long-term performance that our diversity model was designed to produce and its working. Two months ago I provided 2003 revenue and earnings guidance to the market at levels of 4.4 to $4.6 billion of revenue and $4.25 to $4.60 earnings per share. Based on our current outlook, I'm pleased to reiterate that guidance today.

See id. at ¶ 56. MacInnis also commented on the short term projects Emcor engaged in during the first quarter of 2003.

> [First quarter revenues] showed very substantial organic growth, even though I will still say that the quick turn, small task, short term projects that make up a substantial part of that business and a substantial part of our profitability, are still not as strong as we would like, because a great many of those are associated with the private sector and the commercial buildings market.

See id. at ¶ 57. MacInnis also stated:

> . . . as I was mentioning . . . I think that its fair to say that we're still not seeing a substantial improvement in that kind of fast turn work. That is the kind of voluntary small under-the-radar capital spending that we frequently get from owners or end users of commercial buildings and it, like the rest of the commercial buildings market, continues to be depressed . . . .

See id. at ¶ 59. When asked to quantify the percentage of revenue that derived from this sub-$250,000 work, Chesser responded "No, we have not broken that down. Historically, it's in that 20 percent range." See id.

MacInnis reiterated again Emcor's previous guidance:

> As I mentioned during the last conference call, my underlying assumptions with respect to the lower end or base case per our guidance – that is $4.4 billion of revenue and 4.25 per share – do not assume any improvement in the private sector for the remainder of this year. That is status quo with what pertained at year end, whereas the upper end of the range that I reiterated this morning – $4.6 billion of revenue and $4.60 per share – assume a modest improvement in the private sector in the second half of this year.

See id. at ¶ 60. MacInnis reiterated the guidance again in an interview on May 20,

2003, while acknowledging that Emcor was "still reliant, primarily, on the public and quasi-public sector for our growth this year." See id. at ¶ 62.

Even after Emcor revised their guidance downward on July 24, 2003, it maintained that it did not assume any increase in private sector construction spending. See id. at ¶ 5. MacInnis explained on July 24, 2003:

> Along with this overall growth [in the backlog] from about a billion dollars at the end of 1997 to an all time record level of $3.2 billion today, our contract backlog has become much more diverse and resistant to volatility in recent periods. Despite continued weakness in demand for continued construction for example, EMCOR's overall backlog has grown steady due to our strength in growth markets like transportation, institutional work including educational facilities and healthcare.

> \* \* \*

> We expect second half revenue to be similarly strong at levels of 2.2 to 2.4 billion dollars, and we reiterate full year 2003 revenue guidance of 4.4 to 4.6 billion dollars. We also expect our contract backlog balance to remain strong. Our previous guidance with respect to profitability was explicitly based on the maintenance of the status quo which existed at the end of 2002 with respect to both our public and private sector demand. That assumption did not materialize. We have, in fact, experienced a further deterioration in our private sector mechanical construction and service markets .... Although most economists expect a general economic recovery to take [root] in the second half of 2003 and to accelerate in 2004, we are unwilling to rely on any such general improvement in our overall markets.

See id.

In an analyst's call on the same day, MacInnis again confirmed that Emcor's new earnings were not based on an assumption that private section construction spending would improve. MacInnis stated:

> As I mentioned during the last conference call, my underlying assumptions with respect to the lower end or base case per our guidance – that is $4.4 billion of revenue and 4.25 per share – do not assume any improvement in the private sector for the remainder of this year.

See id. at ¶ 6. He also stated again that "[Emcor's] backlog on the construction side consists of a larger than usual proportion of public and quasi public sector companies." See id. at ¶ 71.

In October 2003, Emcor announced a lowering of guidance. In an October 2, 2003 press release, Emcor reiterated its revenue guidance of between $4.4 and $4.6 billion, but drastically lowered its earnings per share guidance to between $1.65 and $1.75 per share. See id. at ¶ 74. Emcor stated that "gross profits continue to be restrained by the high proportion of public sector work within backlog, continued recessionary conditions in most of EMCOR's markets . . . and a reduced level of private sector, discretionary, small project work, which typically generates higher gross margins than longer-term work." See id. The press release also cited the slower-than-anticipated return to profitability of Emcor's United Kingdom subsidiary as having an impact on Emcor's results. See id.

On an October 3, 2003 conference call, MacInnis stated:

[W]hen I [reviewed operations reports] in July – taking into account the reports from all the operational personnel, taking a look at the cash, looking at the investment that we had in various projects – I could see, and stated this on the call, that the second half of the year would be substantially dependent on the recovery of the UK company; our acquisition of the high margin HVAC and electrical service work that we hadn't gotten in the first half of the year, primarily due to both the economy and to weather-related effect; and also, the profitability – the return to better performance of our mechanical operations overall, including the Midwest; and continuation of profitability of our Northeastern Electrical.

See id. at ¶ 79. Later, in an interview with *Contractor* in May 2004, MacInnis stated:

As a result of that shortage [i.e. a "severe shortage of private sector commercial work"], we acquired significantly more public sector work than would have been the pattern . . . . In mid-2003 we began to intentionally

> manage down our public sector component of our construction backlog in order to prepare for improving times and to ensure that we had sufficient capacity to take on an [sic] manage higher margin private work when it became available.

See id. at ¶ 9. The result of Emcor's lowering of earnings guidance was a drop in Emcor's stock price. By October 6, 2003, Emcor's stock had fallen 20% to close at $34.79. See id. at ¶ 75.

On July 29, 2004, Mark Coffey filed his Amended Complaint on behalf of all persons "who purchased or otherwise acquired the common stock or other publicly-traded securities of EMCOR between April 9, 2003 and October 2, 2003, inclusive . . . ." See id. at ¶ 2. The Amended Complaint contains two counts: 1) violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5, and 2) violation of Section 20(a) of the Exchange Act. Defendants motion to dismiss the Amended Complaint was filed on August 31, 2004.

## II. STANDARD OF REVIEW

A motion to dismiss filed pursuant to Rule 12(b)(6) can be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). See also Reed v. Town of Branford, 949 F. Supp. 87, 89 (D. Conn. 1996). "Consideration is limited to the facts alleged in the complaint and any documents attached to the complaint or incorporated by reference." Rombach v. Chang, 355 F.3d 164, 169 (2d Cir. 2004). In considering such a motion, the court accepts the factual allegations alleged in the complaint as true and draws all inferences in the plaintiff's favor. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), *overruled on other grounds by* Davis v. Scherer,

468 U.S. 183 (1984).

A Rule 12(b)(6) motion to dismiss cannot be granted simply because recovery appears remote or unlikely on the face of a complaint. Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Id. (quotation omitted). "In considering a motion to dismiss . . . a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference . . . [and review all allegations] in the light most favorable to the non-moving party." Newman & Schwartz v. Asplundh Tree Expert Co., Inc., 102 F.3d 660, 662 (2d Cir. 1996). "While the pleading standard is a liberal one, bald assertions and conclusions of law will not suffice." Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir. 1996).

## III.  DISCUSSION

In order to state a cause of action under Section 10(b) of the Exchange Act and Rule 10b-5, "a plaintiff must plead that the defendant made a false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused plaintiff's injury." San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 808 (2d Cir. 1996); see also Rombach, 355 F.3d at 169 n.4. "[A] securities fraud complaint must . . . plead certain facts with particularity in order to state a claim." Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000). In order to plead fraud with particularity, Fed. R. Civ. P. 9(b) requires a plaintiff to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were

fraudulent." Rombach, 355 F.3d at 170 (quotation omitted). This rule applies to claims brought under Section 10(b) and Rule 10b-5. See id. Similarly, under the PSLRA, "[a] securities fraud complaint alleging misleading statements or omission of material fact must 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'" Id. at 170 (quoting 15 U.S.C. § 78u-4(b)(1)).

As quoted at length in Section II *supra*, the Plaintiffs have specified several statements made either by Emcor, through press releases, or the Individual Defendants, on conference calls or in similar venues, that they allege are fraudulent or evidence material omissions. The Plaintiffs argue in their memorandum in opposition to the motion to dismiss, when addressing the particularity requirement, that their claims "center around the Defendants' assumptions regarding economic growth in 2003. Although Defendants initially contended that when they gave their earnings guidance for 2003 they were not assuming that the private sector markets would improve, they later admitted that earnings were off because they had in fact assumed the private markets would take a turn for the better." Pl's Mem. Opp. Mot. to Dismiss at 11. The Plaintiffs argue that "[b]ecause these [later] admissions contradict the previous assertions . . . the Complaint has clearly demonstrated that the statements at issue were false when made . . . [and] 'the reason or reasons why the statement[s were] misleading . . . .'" Id. at 13. In essence, the statements made by Emcor and the Individual Defendants "were misleading because the Defendants did not reveal their true belief about the private construction market, i.e., that it would improve." Id.

-10-

However, a review of the statements cited by the Plaintiffs in their memo in opposition, and the supposedly contradictory admission made afterward, show that this is not the case. To demonstrate requires the court to quote the Plaintiffs' particularity argument at length. The Plaintiffs argue that the following statements[2] made by the defendants during the Class Period were misleading:

- "[The] underlying assumption with respect to the lower end or base case per our guidance . . . do [sic] not assume any improvement in the private sector for the remainder of this year." (¶ 4.)

- "[We see] no sign so far of the resumption of the kind of high margin private sector work on which we thrive. It will come and when it does we will be ready, but we don't see it so far." (¶ 44.)

- "[Growth] will appear in the construction sector. In the latter case, a lot depends on what part of the construction sector it appears in." (¶ 44.)

- "The assumptions underlying this range of estimated earnings are the same as for our revenue estimates, that is a flat status quo market on the low end and a modest amount of second half private sector growth at the top end." (¶ 45)

- "Neither a war nor slack in capital spending will slow our results." (¶ 49.)

- "[W]e are unwilling to rely on any such general improvement in our overall markets." (¶ 69.)

- "Our previous guidance with respect to profitability was explicitly based on the maintenance of the status quo which existed at the end of 2002 with respect to both our public and private sector demand." (¶ 5.)

Id. at 11-12.

The Plaintiffs cite several statements made by the defendants in October 2003

---

[2]The paragraph citations to the Amended Complaint included in this list are those given by the Plaintiffs in their memorandum in opposition.

and after the Class Period that they claim are contradictory. The statements the Plaintiffs cite as contradictory, and hence as the reasons why the above statements were false or misleading, are as follows:

- Defendants had believed that high margin private sector work would return "in a way that was going to significantly supplement [the Company's] margins." (¶ 77.)[3]

- "We had not contemplated that the public work – and frankly, some of the private sector work that continued to be provided to our customers in the Northeast – would proceed as poorly as it did." (¶ 80.)

- "[T]he anticipated recovery in small-project discretionary spending has been slower and less profitable than anticipated." (¶ 74.)

- "I [MacInnis] could see . . . that the second half of the year would be <u>substantially dependent on the recovery</u> of the UK company; our acquisition of the high margin HVAC and electrical service work that <u>we hadn't gotten in the first half of the year, primarily due to both the economy</u> and to weather-related effect; and also <u>the profitability – the return to better performance</u> . . . ." (¶ 8.) (emphasis in original)

- "As a result of that shortage [<u>i.e.</u>, a 'severe shortage of private sector commercial work'], we acquired significantly more public sector work than would have been the pattern," says Frank T. MacInnis, chairman and CEO. "In mid-2003 we began to intentionally manage down our public sector component of our construction backlog in order to prepare for improving times and to ensure that we had sufficient capacity to take on and manage higher margin private work when it became available." (¶ 9.)

Id. at 12-13. However, these statements do not contradict the defendants' prior statements regarding the assumptions they made when calculating their guidance

---

[3]In fact, paragraph 77 of the Amended Complaint states that Emcor's guidance was based on "assumptions that its earnings from high margin, private sector small projects or fast turn projects and other high margin private sector work would return 'in a way that was going to significantly supplement [the Company's] margins' . . . . Am. Compl. at ¶ 77 (emphasis omitted). A statement that the company's earnings from such work as it was able to get would increase is not the same thing as a statement that more of this work would be available due to an upturn in the economy.

-12-

numbers. As noted in footnote 3, the correct citation to paragraph 77 of the Amended Complaint shows that the first bulleted statement refers to an assumption about increased earnings from private sector work Emcor obtained, not to an overall increase in the availability of that work or an increase in the economy generally. The second bulleted quotation merely points out that the economy fared even worse than Emcor had expected, a fact that Emcor freely admitted prior to October 2003. See Am. Compl. at ¶ 5 ("Our previous guidance with respect to profitability was explicitly based on the maintenance of the status quo which existed at the end of 2002 with respect to both our public and private sector demand. That assumption did not materialize. We have, in fact, experienced a further deterioration in our private sector mechanical construction and service markets . . . .")

Furthermore, the third bulleted quotation is clearly taken out of context. In the paragraph of the press release immediately preceding that quote, which is a sentence within a longer quotation attributed to MacInnis, the text reads: "However, gross profits continue to be restrained by the high proportion of public sector work within backlog, continued recessionary conditions in most of EMCOR's markets, especially in the Midwestern and Northeastern U.S., and a *reduced level* of private sector, discretionary, small project work, which typically generates higher gross margins than longer-term work." Am. Compl. at ¶ 74 (emphasis added). The later quote attributed to MacInnis that the "anticipated recovery" of such projects "has been slower and less profitable than anticipated" must be read in that context. As noted *supra*, Emcor previously explicitly stated that it expected the economy to remain at the 2002 status quo, and that the economy had actually regressed at points. See id. at ¶ 5. It is apparent in context

that MacInnis's statement referred to the unexpected reduction of the small, profitable, discretionary projects noted in the paragraph directly preceding his quotation, rather than maintenance of the status quo, when it noted that "spending has been slower and less profitable than anticipated." Id. at ¶ 74. The court finds that that single sentence, in context, is not evidence that Emcor's statements regarding their assumptions concerning the state of the economy generally throughout 2003 were false or misleading when made.

The quotation in the fourth bullet point does not contradict Emcor's previous statements regarding the assumptions they used to formulate their guidance numbers for the simple reason that it does not refer to the economy at all, but to the performance of Emcor and its subsidiaries. While the Plaintiffs emphasize the phrase "substantially dependent on the recovery," that phrase refers to recovery of a UK subsidiary of Emcor, not the economy in general. Also, the next point of emphasis refers to work that Emcor had not received in the first half of the year due in part to the economy. In context, it is clear that this statement refers to the worsening of the economy, due to elements such as weather, that Emcor referred to in earlier statements regarding its guidance, and not the status quo it relied upon. Even so, its point is Emcor's need to capture work it had failed to capture in the first half, not a statement regarding the prospects of the general economy. The final point of emphasis, the phrase "the profitability – the return to better performance," trails off before the reader can discover what Emcor depended upon to perform better. A brief review of paragraph 7[4] of the Amended Complaint reveals that

---

[4] While the plaintiffs' memorandum cites to paragraph 8, this quotation actually appears in paragraph 7 of the Amended Complaint.

-14-

MacInnis was referring to the return to better performance of Emcor's mechanical operations, with an emphasis on the Midwest, and continued profitability of Emcor's Northeastern Electrical. Therefore, this statement did not refer to the economy at all, but to performance by Emcor's own divisions. In short, all references made by MacInnis in that quotation to recognizing a need for stronger performance referred to Emcor itself, and not the economy in general. It does not contradict Emcor's previous statements.

Finally, the last quotation refers to management's decision in mid-2003 to shift Emcor's backlog away from low-profit public sector work in order to ensure Emcor had the capacity to take on high-profit private sector work once the economy improved. The Plaintiffs claim that these statements constitute evidence that Emcor's management did rely upon an improved economy when making their guidance projections. This is not so. Merely because management optimistically prepares to take advantage of a future upswing in the economy does not mean that it depended upon such an upswing to formulate its guidance numbers. Management is free to plan optimistically while basing its guidance on a more conservative outlook. The two positions are not mutually inconsistent. It is only when management *bases its guidance* on optimism, but claims conservatism to the public, that it misleads. That is not the case here.

The Plaintiffs rely on the alleged "contradictory" statements to show that the defendants' statements were false when made and to explain "'the reason or reasons why the statement[s were] misleading . . . .'" Pl's Mem. Opp. Mot. to Dismiss at 13 (citing 15 U.S.C. § 78u-4(b)(1)). In light of the court's conclusion that the statements are not contradictory, no inference of a misleading nature could be drawn from them.

Thus, the Plaintiffs have failed to plead this element as required. Therefore, the Plaintiffs have failed to meet the pleading requirements for securities fraud complaints specified in Rombach and under the PSLRA, and their claims under Section 10(b) and Rule 10b-5 must be dismissed. See 15 U.S.C. § 78u-4(b)(1); see also Rombach, 355 F.3d at 170.[5]

### B.    Section 20(a)

The Plaintiffs also allege that the Individual Defendants violated Section 20(a) of the Securities Exchange Act in their capacity as control persons of Emcor. See Am. Compl. at ¶¶ 101-05. Control person liability under Section 20(a) "is necessarily predicated on a primary violation of securities law." Rombach, 355 F.3d at 178. The court has already determined that the Plaintiffs' claims of a primary violation of Section 10(b) and Rule 10b-5 must be dismissed. Therefore, the Plaintiffs' claims against the Individual Defendants under Section 20(a) must be dismissed as well. See id.

## IV.    CONCLUSION

For the foregoing reasons, defendant's Motion to Dismiss [Dkt. No. 36] all counts of the Amended Complaint is hereby **GRANTED**. The clerk is ordered to close the case.

---

[5] In light of this conclusion, the court does not reach the other grounds raised in the motion to dismiss.

**SO ORDERED.**

Dated at Bridgeport, Connecticut, this 22nd day of July, 2005.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge